Carl KELLY, Appellant,

v.

STATE of Alaska, DEPARTMENT
OF CORRECTIONS, Appellee.

No. S–12814.

Supreme Court of Alaska.

Oct. 16, 2009.

Joseph A. Kalamarides, Kalamarides & Lambert, Anchorage, for Appellant.

Daniel N. Cadra, Assistant Attorney General, Anchorage, and Richard A. Svobodny, Acting Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, EASTAUGH, CARPENETI, WINFREE, and CHRISTEN, Justices.

*OPINION*

FABE, Chief Justice.

## I. INTRODUCTION

A prison guard filed a report of injury for job-related stress after being threatened with serious physical injury and possible death by an inmate who had been convicted of murder and was armed with a weapon. For over five years, the State paid workers' compensation benefits to the guard, including permanent partial impairment and reemployment benefits. But more than nine years after the threat, the State filed a notice of controversion, raising for the first time the defense that the employee's claim was not compensable. Though all doctors who examined the guard agreed that work stress led to the employee's mental health problems, the Alaska Workers' Compensation Board found that the employee's injury was not compensable because the stress he experienced was not extraordinary and unusual for a prison guard. It also rejected the guard's argument that laches or estoppel should bar the State from disputing the compensability of the claim. The Alaska Workers' Compensation Appeals Commission affirmed the Board. Because the Board and Commission misinterpreted the "extraordinary and unusual" requirement for mental stress claims, we reverse the Commission's decision and remand for a determination whether the guard is permanently and totally disabled.

## II. FACTS AND PROCEEDINGS

Carl Kelly began working as a prison guard at Cook Inlet Pretrial Facility in 1987. Kelly worked on a rotation schedule, working seven 12–hour days, followed by seven days off. His duties included transporting prisoners from place to place within the facility, booking prisoners, and serving as a module officer.

As a module officer, Kelly supervised the inmates in a particular unit; he testified that he spent his whole shift with between twelve and forty-eight prisoners in a unit, acting as "a babysitter." When serving as a module officer, Kelly was the only Department of Corrections employee in the unit and was locked in with the prisoners. Module officers were unarmed and had only a radio for communicating with other staff. Their keys only locked individual cells within the unit. Each housing unit had a desk for the module officer's use; the desk was in the living area occupied by the inmates when they were not locked down. Kelly testified that he received minimal training because the facility was understaffed when he began to work there and that the facility remained overcrowded and understaffed throughout his course of employment.

Kelly reported difficulties at work after the State began to house younger offenders, including juveniles who had been waived to adult status, at Cook Inlet Pretrial Facility. Kelly testified that the younger prisoners were more defiant, less likely to take orders from him, and more likely to fight with each other. In addition to the increased stress from the younger inmates, Kelly described death threats by two inmates, which were particularly frightening to him. One inmate repeatedly threatened to kill Kelly after he was released from prison and told Kelly that he knew where Kelly lived. Another inmate, who had been convicted of the rape and murder of a child and sentenced to ninety-nine years, threatened Kelly after Kelly wrote him up for an infraction.

According to Kelly, one day he temporarily relieved a guard who was assigned to the module that housed prisoners with mental health problems. Kelly was not generally assigned to "Mike Mod," where these prisoners were housed, because personnel assigned there needed to have specialized training, which Kelly lacked. The inmate Kelly had disciplined had been convicted of murder and was in the mental health unit because the segregation unit he had been assigned to was full. When the inmate saw Kelly, he came over to the desk where Kelly was sitting. The inmate, who had a sharpened pencil, stood in front of the desk and told Kelly that he could stab Kelly in the eyes with the pencil, take his radio and keys, and then stab him to death. Kelly testified that the convicted murderer was very strong and got "drunk on [h]air spray." Kelly believed that the inmate would carry out his threat and was afraid to call for help. When Kelly

failed to respond on his radio to calls from other correctional officers, guards came to investigate. Kelly testified that the inmate did not back off until three correctional officers came to Kelly's assistance. Kelly was not allowed to work in the same unit as the threatening inmate after this incident.

Kelly filed his report of injury between six months and a year after the threat. The other stressors that eventually prompted Kelly to seek medical attention and file a report of injury were more mundane—inmates throwing things at him and pouring urine on his chair. On April 12, 1995, after some difficulties with prisoners in his unit, Kelly felt that his blood pressure was rising, and he began to experience chest pain. He went to the medical staff at Cook Inlet Pretrial Facility, who took his blood pressure and started him on oxygen. Kelly also took nitroglycerin. He was taken to the hospital, where he remained overnight. He was discharged the next day with a diagnosis of "[c]hest pain, unclear etiology probably not cardiac."

Kelly filed a report of injury on May 5, 1995, listing his injury as angina, and describing his illness as "chest pains, shortness of breath, high blood pressure, dizziness." The report stated that Kelly was "stressed out" by a prisoner or prisoners, which led to an angina attack. The State began to pay temporary total disability (TTD) benefits on June 15, 1995.

Kelly received treatment from Edward Brown, M.D., who noted hypertension, borderline tachycardia, and chest pain. Dr. Brown stated in his May 10, 1995 chart notes that Kelly's "significant anxiety" was probably causing the chest pain. Dr. Brown's chart notes from June 8, 1995, indicated that Kelly was "very concerned over his personal safety at work, outside of work, and keeps envisioning situations in which if he was seen by former inmates that have threatened him in the past, that he may end up injured or killed." Dr. Brown prescribed antidepressant and antianxiety medication for Kelly and

eventually diagnosed him with posttraumatic stress disorder (PTSD). Dr. Brown referred Kelly to Osamu Matsutani, M.D. for psychiatric treatment. Dr. Matsutani continued Kelly's antidepressant medication but did not provide other types of therapy.

In June 1996 the State required Kelly to attend an employer's independent medical evaluation (EIME) with James Robinson, M.D., Ph.D. Dr. Robinson's medical specialty was physiatry,[1] but he was also a psychologist. Dr. Robinson performed a psychological evaluation of Kelly but was unable to give a definitive diagnosis because he thought that some of Kelly's medical tests suggested alcohol abuse. Kelly underwent an alcohol evaluation in September 1997; the evaluator diagnosed alcohol dependency in remission and did not recommend treatment. The evaluator noted that Kelly might have been self-medicating his PTSD with alcohol.

Kelly went to a second EIME with Dr. Robinson in December 1997. By then, the blood chemistry that had concerned Dr. Robinson was within normal limits. Dr. Robinson did not make a definitive diagnosis in 1997 either; the diagnoses Dr. Robinson provided were "Rule out post traumatic stress disorder" and "Rule out adjustment disorder with mixed disturbance of emotions and conduct." In spite of the lack of a firm diagnosis, Dr. Robinson gave the opinion that Kelly could not return to work as a correctional officer, was medically stable, and had a "ratable impairment as a result of" his work injury. Dr. Robinson later rated Kelly as having a twelve percent whole man permanent partial impairment (PPI) because of psychological symptoms.

In the summer of 1998 Kelly and the State's adjuster signed a reemployment plan to train Kelly as a computer repairperson. Kelly completed training for certification as an entry-level computer service technician and worked for awhile at a computer repair business in Homer called TechConnect. The State continued to pay for Kelly's medication management with Dr. Matsutani, including

1. Physiatry, also known as "physical medicine," is defined as "[d]iagnosis, prevention, and treatment of disease by essentially physical means, including exercise, manipulation, massage, and the application of heat, cold, radiation, or electricity." WEBSTER'S II NEW COLLEGE DICTIONARY 850–51 (3d ed.2005).

reimbursement for Kelly's trips to Anchorage.

In 2000 the State changed workers' compensation insurance adjusters. After the change in adjusters, the State refused to reimburse Kelly for the full amount of mileage to Anchorage because it decided that necessary medical treatment was available in Soldotna, closer to Kelly's home. In August 2000 Kelly filed a workers' compensation claim for the mileage, identifying "posttraumatic stress syndrome" as his illness. The State filed a notice of controversion. At an April 23, 2002 prehearing conference, Kelly orally amended his workers' compensation claim to include a claim for permanent total disability (PTD) benefits.

In May 2003 Kelly underwent another EIME. This EIME was performed by Patricia Lipscomb, M.D., Ph.D., a psychiatrist. In her July 15, 2003 report, Dr. Lipscomb diagnosed Kelly with anxiety disorder, alcohol abuse in remission, and polysubstance abuse in remission. Even though she disagreed with the PTSD diagnosis, she gave the opinion that "on a more-probable-than-not basis" Kelly's "work stress did contribute to the development of [his] anxiety disorder." But she stated that in her opinion, Kelly had not suffered an injury as defined by Alaska law because the stresses he underwent were "just like those that the other correctional officers were subjected to and that he was not treated differently by the inmates than other correctional officers were."

On April 20, 2004, the State filed a controversion notice controverting all benefits based on Dr. Lipscomb's report. The parties stipulated to a second independent medical evaluation (SIME), and on November 23, 2004, the Board ordered an SIME with Ronald Early, M.D., Ph.D., a psychiatrist.

After examining Kelly and reviewing his medical records, Dr. Early diagnosed Kelly with PTSD that was "causally related to the industrial injury on a more probable than not basis." Dr. Early considered the specific threat to stab Kelly sufficiently traumatic to "justify the diagnosis of [PTSD]." Acknowledging that many prison guards are threatened by inmates, Dr. Early stated that Kelly "clearly identified his experiences as terrifying and psychologically traumatic to him." Dr. Early also wrote, "The cumulative psychological trauma associated with repeated threats to his life or well[-]being suggests that his perception of the trauma was in excess of what he would anticipate as part of his job duties, even though he knew that he worked in a generally risky environment."

Dr. Early's report identified work-related stress as the predominant cause of Kelly's mental injury, recommended continuing medication for PTSD, and stated that Kelly was medically stable as of September 1998 but could not return to work as a correctional officer. Dr. Early did not think that Kelly's mental health status would prevent him from working as a "microcomputer support specialist."

The Board held a hearing on Kelly's claim on May 26, 2006. Dr. Early and Dr. Matsutani testified by deposition. Dr. Matsutani's deposition testimony indicated that in his opinion, Kelly's work-related stress was the cause of his PTSD. Kelly and the State presented a number of witnesses, including Dr. Lipscomb; Sergeant Martin Crowley, a correctional officer; and Kelly. Kelly testified about his work and his disability. He recounted the particular threats that he found most disturbing, especially the death threat by the convicted murderer, and described his stress level in general. Kelly testified that even though it was not unusual for prison guards to endure threatening remarks, it was uncommon for inmates to make death threats like the ones made to him. He also testified about his current medical condition and the limitations on his activities and employment opportunities.

Dr. Lipscomb testified consistently with her report. She stated that in her opinion, the events that Kelly described were not sufficiently severe to warrant a diagnosis of PTSD. Instead, she concluded that Kelly suffered from an anxiety disorder. She also gave the opinion that Kelly's job as a correctional officer "contribute[d] to the development of [his] anxiety disorder," but that his illness was not compensable because the definition of compensable mental injury in the statute "would require that the stress that he

was subjected to was a good bit more than other similarly situated employees, and that did not appear to be the case." She criticized Dr. Early's report because she did not think that Dr. Early addressed whether Kelly's "work stress was extraordinary" and "because what he seemed to be saying was that Mr. Kelly found it to be particularly stressful." She noted that Dr. Early's opinion about the nature of Kelly's stress "seemed to have mainly to do with the subjective experience." Dr. Lipscomb also testified that PTSD is a type of anxiety disorder and that it is not unusual for doctors to come to different conclusions about diagnoses when there are shared diagnostic criteria.

Sergeant Martin Crowley, who worked at Cook Inlet Pretrial Facility for eight years beginning in 1993, testified about his experience as a correctional officer. He testified that he could recall threats to his life, but most of the threats he described were from inmates who were intoxicated and, in many cases, in holding cells. He conceded that he did not consider the threats "viable," although he would document them "for discipline reasons." He acknowledged that he could recall threats from inmates in the general population "very, very seldom."

In its decision, the Board decided that Kelly's claim was not compensable because his "work stress was not extraordinary and unusual in comparison to pressures and tensions experienced by the other corrections officers employed by the employer at the same time." The Board found that Kelly "suffer[ed] from a mental injury," but that it did not need to determine whether he suffered from PTSD or an anxiety disorder. The Board found that Dr. Early's conclusion about causation was "based on an analysis that is contrary to Alaska law" because Dr. Early "focused on whether the stress was discrete to the employee and greater than that which he would experience on a daily

basis." It found that Dr. Early "focused on how [Kelly] perceived the stress" and that he "should have addressed whether the work stress was extraordinary and unusual in comparison to pressures and tensions experienced by individuals in a comparable work environment, not whether the stress was extraordinary as perceived by the employee." As a result, the Board gave Dr. Early's report "little if any evidentiary weight."

The Board gave great weight to Crowley's testimony and noted that Kelly admitted that his coworkers were under similar stress. It found that any lack of training "would reasonably only [be] expected to affect [Kelly] for the first year, at most." It also decided that it would not be extraordinary and unusual for a correctional officer to be threatened by inmates and to see released inmates sometimes. The Board rejected the equitable arguments raised by Kelly because it determined that he had not shown prejudice.[2] The Board found that Kelly's claim that he was hindered in preparing his case was "not supported by the record." It also found Kelly's claim that he had not appealed his Public Employees' Retirement System (PERS) decision in reliance on receipt of workers' compensation benefits to be "disingenuous."[3]

Kelly appealed to the Alaska Workers' Compensation Appeals Commission, which affirmed the Board's decision. The Commission focused first on Kelly's equitable arguments, finding that the State had not asserted an inconsistent position for purposes of quasi-estoppel. It also determined that substantial evidence in the record supported the Board's finding that Kelly was not prejudiced by the State's conduct. The Commission decided that the Board permissibly admitted the Retirement Board decision in spite of Kelly's objection that it was not relevant. The Commission considered the Board's interpretation of Dr. Early's testimony reason-

2. Before the Board, Kelly argued that laches or estoppel should bar the State from contesting the compensability of his claim. Kelly based his argument on the State's payment of benefits over many years and its failure to raise the issue of extraordinary stress for nine years after his injury.

3. Kelly applied for PERS occupational disability benefits in October 1995. This application was denied. He appealed the denial to the Public Employees' Retirement Board and also sought non-occupational disability benefits. The Retirement Board denied both claims. Kelly did not appeal the Retirement Board decision.

able, but concluded that regardless of Dr. Early's testimony, Crowley's testimony provided substantial evidence in the record to support the Board's decision that Kelly had not suffered an injury as defined under former AS 23.30.395(17). Kelly appeals.

## III. STANDARD OF REVIEW

 In an appeal from the Alaska Workers' Compensation Appeals Commission, we review the Commission's decision.[4] We exercise our independent judgment in questions of law that do not involve agency expertise.[5] We independently review the Commission's legal conclusion that substantial evidence supports the Board's findings; this requires us to review the record and the Board's factual findings independently.[6] "Substantial evidence to support factual findings is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[7] We also independently review the Commission's legal conclusion about the Board's exercise of discretion, independently assessing the Board's action.[8] An abuse of discretion exists when, after reviewing the record, we are left with a definite and firm conviction that a mistake has been made.[9]

## IV. DISCUSSION

### A. It Was Error To Conclude that Substantial Evidence Supported the Board's Finding that Kelly's Stress Was Not Extraordinary and Unusual.

 At the time of Kelly's claim of injury, an "injury" for purposes of the Alaska Workers' Compensation Act did not include "mental injury caused by mental stress unless it [was] established that (A) the work stress was extraordinary and unusual in comparison to pressures and tensions experienced by individuals in a comparable work environment, and (B) the work stress was the predominant cause of the mental injury."[10] The amount of work stress was required to be "measured by actual events," and the work stress could not be caused by personnel actions such as work evaluations or terminations.[11] An employee was required to prove each element of the test for mental injury by a preponderance of the evidence, without the benefit of the presumption of compensability.[12]

The Commission concluded that substantial evidence in the record supported the Board's finding that Kelly had not "experience[d] extraordinary and unusual pressures and tensions in his employment." The Commission stated that "Crowley's testimony established that Kelly's perception that 'the trauma was that it was in excess of what he would have anticipated as part of his job'. was mistaken."

Kelly argues that the Commission's conclusion was erroneous because the death threats he described were extraordinary and unusual even for prison guards. Kelly also contends that the Board improperly discounted Dr. Early's opinion because the Board misconstrued the former statute as prohibiting consideration of personal perceptions in evaluating whether the stress experienced by the employee was "extraordinary and unusual." The State responds that the statute "ma[de] the test for compensability an objective one," so that it was irrelevant "whether the employee subjectively perceived the stressors as

---

4. *Barrington v. Alaska Commc'ns Sys. Group, Inc.,* 198 P.3d 1122, 1125 (Alaska 2008).

5. *Id.*

6. *Smith v. CSK Auto, Inc.,* 204 P.3d 1001, 1007 (Alaska 2009).

7. *Id.* (quoting *DeYonge v. NANA/Marriott,* 1 P.3d 90, 94 (Alaska 2000)).

8. *Bohlmann v. Alaska Constr. & Eng'g, Inc.,* 205 P.3d 316, 319–20 (Alaska 2009).

9. *Dougan v. Aurora Elec., Inc.,* 50 P.3d 789, 793 (Alaska 2002) (citing *Morgan v. State, Dep't of Revenue,* 813 P.2d 295, 297 n. 4 (Alaska 1991)).

10. Former AS 23.30.395(17).

11. *Id.* In 2005 the legislature removed the provisions related to mental stress from the definition of "injury." Ch. 10, § 66, FSSLA 2005. Similar limitations on stress-related claims were placed in a different statutory section. Ch. 10, § 9, FSSLA 2005 (*codified at* AS 23.30.010(b)).

12. *See Williams v. State, Dep't of Revenue,* 938 P.2d 1065, 1071–72 (Alaska 1997).

unusual and extraordinary." It also maintains that substantial evidence in the record supports the Board's findings because Crowley "testified that he, too, had received threats to his life" and because Dr. Lipscomb concluded that Kelly had not suffered a "compensable injury ·as defined by Alaska law."

## 1. Mental injury claims

Work-related mental injuries have been divided into three groups for purposes of analysis: mental stimulus that causes a physical injury, or "mental-physical" cases; physical injury that causes a mental disorder, or "physical-mental" cases; and mental stimulus that causes a mental disorder, or "mental-mental" cases.[13] Kelly's PTD claim is a mental-mental claim because he asserts that the mental stress of his job as a correctional officer caused a mental disorder, PTSD.[14]

According to the Larsons' treatise, "[m]oving from the broadest to the narrowest coverage," states can be divided into four categories in their treatment of mental-mental claims: (1) claims for gradual work-related stress are allowed, and the stress only needs to be a causative factor in the mental condition; (2) compensation for gradual mental stress is permitted, but only if the stress is unusual or extraordinary; (3) compensation is allowed only when there is a sudden shock or stimulus; and (4) no compensation is given for any mental-mental claim.[15] Alaska is in the second group, permitting mental claims for gradual stress as long as the stress is "extraordinary and unusual."[16]

Before the legislature narrowed the definition of injury for work-related mental stress claims, Alaska was in the first of the Larsons' categories, making no distinction between mental and physical injuries.[17] The legislature's purpose in limiting workers' compensation claims for mental injuries caused by work-related stress was to overrule our decisions in *Fox v. Alascom, Inc.*[18] and *Wade v. Anchorage School District*[19] because of concerns that these decisions would open the workers' compensation system to an increased number of claims and make it difficult for employers to defend against stress claims.[20]

In *Fox*, we held that mental claims should be analyzed in the same way as physical claims and rejected the use of objective tests similar to the "unusual stress in the profession test" as thresholds to be attained before the presumption of compensability attaches.[21] In *Wade*, we refused to adopt the "unusual stress in the profession test" in evaluating a stress claim after the presumption of compensability had been established, although we acknowledged that the test could be "relevant to determining whether a stress disability suffered by an employee was job related."[22]

Both *Fox* and *Wade* also involved stress claims in which the employee's stress was ascribed to events in the workplace that others disputed. In *Fox*, the employee felt

---

13. *See* 3 Arthur Larson & Lex. K. Larson, Larson's Workers' Compensation Law § 56.01 (2008).

14. The parties appear to agree that initially Kelly's claim was a mental-physical claim because he reported that he suffered from angina caused by the stress of his work.

15. 3 Larson & Larson, *supra* note 13, § 56.06[2] (footnote omitted).

16. AS 23.30.010(b); *see also* former AS 23.30.395(17); 3 Larson & Larson, *supra* note 13, § 56.06D[6] n. 38 (citing *Williams*, 938 P.2d at 1065).

17. *Fox v. Alascom, Inc.*, 718 P.2d 977, 984 (Alaska 1986); *see also* 3 Larson & Larson, *supra* note 13, §§ 56.06[1][b], 56.06D[6] n. 39 (citing *Wade v. Anchorage Sch. Dist.*, 741 P.2d 634 (Alaska 1987); *Fox*, 718 P.2d at 977).

18. 718 P.2d 977.

19. 741 P.2d 634.

20. H. Judiciary Comm., House CS for CS for Senate Bill No. 322(L & C) 18: Sectional Analysis (Apr. 6, 1988); H. Labor & Commerce Comm., Workers' Comp. Legislation Comparative Analysis–House and Senate Bills 9 (Feb. 23, 1988); *see also* Minutes, H. Judiciary Comm. Hearing on S.B. 322, 15th Leg., 2d Sess. (Apr. 16, 1988) (testimony of Janice Hansen, Chief of Adjudications, Alaska Workers' Comp. Bd.).

21. 718 P.2d at 981–84; *see Wade*, 741 P.2d at 638 & n. 5 (explaining the similarities between the test rejected in *Fox* and the "unusual stress in the profession test").

22. 741 P.2d at 638–39.

stressed from "not being told what was expected of her and from being treated unequally."[23] She also "attributed her problems solely to her job" even though she experienced other stressful events in her personal life during the same period of time.[24] Her employer disputed the employee's specific contentions that her supervisors talked about her behind her back and failed to tell her what was expected of her.[25] Likewise, in *Wade*, the employee, who was diagnosed with "an underlying paranoid personality disorder," complained about incidents of harassment and discrimination that were denied by others or "appear[ed] simply harmless."[26] We agreed that substantial evidence supported the Board's finding that the employee's illness "resulted in his misperceiving the reality of various events at school" but held that the employer had not produced substantial evidence to rebut the presumption of compensability.[27]

In response to these cases, the legislature removed the presumption of compensability in mental-mental cases and defined a mental injury to require stress that was "extraordinary and unusual" in comparison to that of similar workers.[28] It prescribed that "the amount of work stress . . . be measured by actual events."[29] Kelly's claim raises two issues related to these legislative enactments. The first is whether the legislature intended to prohibit consideration of the employee's perception of events, and the second is what the legislature meant by "extraordinary and unusual" stress.

### 2. Consideration of the employee's perception

Kelly argues that the Board erred in its evaluation of Dr. Early's testimony because "[n]othing in the act or case law states that personal perceptions cannot be considered in determining whether the stressors were unusual and extraordinary." The Board gave Dr. Early's testimony little weight because it decided that his analysis was not consistent with Alaska law. The Board found that Dr. Early "focused on how the employee perceived the stress" and "whether the stress was discrete to the employee and greater than what he would experience on a daily basis."

■ We agree with Kelly that former AS 23.30.385(17) does not prohibit consideration of a claimant's perception of events. The statutory language required that work-related stress "be measured by actual events."[30] Former AS 23.30.395(17) was silent about a worker's perception of the actual events after the legislature removed a reference to an employee's misperception before passage of the final bill. As originally introduced, the legislation stated, "[T]he amount of work stress shall be measured by actual events rather than misperceptions by the employee."[31] The House Judiciary Committee deleted the phrase about employee misperceptions in response to concerns that it implied that any perception by the employee was a misperception.[32]

To interpret the former statute as prohibiting consideration of a claimant's perception of a frightening, actual event could prevent compensation claims based on the current diagnostic criteria for PTSD. These criteria require a determination by the clinician that a patient's response to a threat of death or serious injury "involved intense fear, help-

---

23. 718 P.2d at 979.

24. *Id.*

25. *Id.*

26. 741 P.2d at 636, 639.

27. *Id.* at 639–40.

28. Ch. 79, §§ 21, 42, SLA 1988. Some states adopted the unusual or extraordinary stress test judicially. *See* 3 Larson & Larson, *supra* note 13, § 56.06[1][c].

29. *Id.* § 42.

30. Former AS 23.30.395(17).

31. Senate Bill (S.B.) 322, 15th Leg., 2d Sess. (Jan. 11, 1988).

32. House Committee Substitute for Committee Substitute for Senate Bill (H.C.S. C.S.S.B.) 322 (Judiciary), 15th Leg., 2d Sess. (Apr. 28, 1988); Minutes, H. Judiciary Comm. Hearing on S.B. 322, 15th Leg., 2d Sess. (Apr. 18, 1988) (comments of Rep. Robin Taylor).

lessness, or horror." [33] Nothing in the legislative history indicates that the legislature intended to prevent PTSD claims by workers.

 But a worker's perception that he feels stress is by itself inadequate to establish "extraordinary and unusual" stress. The perception issue has been framed by other courts as requiring an inquiry into whether the claimed mental injury is the result of "actual, not merely perceived or imagined, employment events." [34] In Kelly's case, the State presented no evidence to suggest that the threats to Kelly did not happen or that he somehow misperceived the inmate's threat to him. Instead, the uncontroverted evidence showed that correctional officials took the threat seriously and ensured that there was no further contact between Kelly and the convicted murderer who threatened him. Although the State's expert expressed the opinion that Kelly's stress was not extraordinary and unusual in comparison with that experienced by other correctional officers at Cook Inlet Pretrial Facility, she nonetheless allowed that "[t]he stress he experienced during his employment with the correctional system could have been sufficient to cause or aggravate an anxiety disorder, not otherwise specified." Finally, nothing in the Board's

decision indicates that it disbelieved Kelly's testimony about the death threats.[35]

### 3. Extraordinary and unusual stress

 To evaluate the Commission's conclusion that substantial evidence supported the Board's finding that Kelly did not experience "extraordinary and unusual" stress, we first examine what "extraordinary and unusual" means in former AS 23.30.395(17). When we interpret a statute, we look at the "plain meaning and purpose of the law as well as the intent of the drafters." [36] "[U]nless words have acquired a peculiar meaning, by virtue of statutory definition or judicial construction, they are to be construed in accordance with their common usage." [37] Here, the legislature did not define "extraordinary and unusual." An examination of the common meaning of the words "extraordinary" and "unusual" does not clarify what the legislature intended. "Unusual" is defined as "[n]ot usual, common, or ordinary." [38] "Extraordinary" means "[b]eyond what is common or usual" or "very exceptional." [39]

Comments by legislators during committee hearings on the bill containing the "extraordinary and unusual" requirement provide insight into the legislature's conception of what would qualify as "extraordinary and unusual"

**33.** Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 467 (rev. 4th ed.2000). Dr. Early testified that only about five to ten percent of the people exposed to a "psychic trauma sufficient to meet the criteria for the diagnosis" of PTSD actually develop the disorder.

**34.** *Davis v. Workers' Comp. Appeal Bd. (Swarthmore Borough)*, 561 Pa.462, 751 A.2d 168, 174 (2000) (citing *Wilson v. Workmen's Comp. Appeal Bd. (Aluminum Co. of Am.)*, 542 Pa.614, 669 A.2d 338, 344 (1996)); *see also Verga v. Workers' Comp. Appeals Bd.*, 159 Cal.App.4th 174, 70 Cal. Rptr.3d 871, 879 (2008) (construing "actual events of employment" as requiring objective evidence of harassment, persecution, or other bases for mental-mental claim); *Smith v. Conn. Light & Power Co.*, 73 Conn.App. 619, 808 A.2d 1171, 1175 (2002) (holding that mental injury did not arise from employment but was based on plaintiff's misperception of "significance and severity" of employer actions).

**35.** *See Hoth v. Valley Constr.*, 671 P.2d 871, 874 n. 3 (Alaska 1983) ("Absent specific findings by the Board that it chose to disbelieve a witness's

testimony, we will not assume that lack of credibility was a relevant factor in the Board's decision."). The Commission interpreted the Board's statement that it found Kelly's "assertion that he did not appeal the PERS decision in reliance on receipt of [w]orkers' compensation benefits disingenuous" to mean that the Board "found his testimony was not credible." The Commission is bound by the Board's findings about "the credibility of testimony of a witness." AS 23.30.128(b). But Kelly never testified about this issue; the assertion the Board mentioned was made by Kelly's attorney in his written closing argument.

**36.** *Young v. Embley*, 143 P.3d 936, 939 (Alaska 2006) (quoting *Native Vill. of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999)).

**37.** *Id.* (quoting *Gov't Employees Ins. Co. v. Graham–Gonzalez*, 107 P.3d 279, 284 (Alaska 2005)).

**38.** Webster's II New College Dictionary 1240 (3d ed.2005).

**39.** *Id.* at 406.

stress. During discussions of the proposed legislation, legislators discussed hypothetical examples of what should qualify as extraordinary and unusual stress; among the examples that legislators thought would be compensable were an ironworker who nearly fell to his death [40] and an air traffic controller who felt responsible for a plane crash that killed many people.[41]

In determining what constitutes extraordinary and unusual stress, Professors Larson and Larson note that cases involving sudden fright and fear are generally "rated unusual in comparison with any norm." [42] They explain that "[e]xcept for the adventurous heroes that inhabit the world of one-hour television thrillers, continuous terror, shock, and dramatic brushes with death are not the normal routine of life." [43] The death threat Kelly received from the inmate who menaced him with a sharpened pencil falls within this class of stress.

In its decision here, the Board did not explain in any detail why the death threat incident did not constitute extraordinary and unusual stress in comparison to pressures and tensions experienced by other prison guards. It stated only that "as a corrections officer it would not be extraordinary and unusual to receive threats, run into released inmates from time to time, etc." The Commission determined that Crowley's testimony provided substantial evidence to support the Board's finding. It went on to say that its "review of the whole record reveal[ed] substantial evidence to support the board's finding."

The Board erred by focusing on the frequency of threats rather than the character and quality of the threats described by Kelly. Even if other prison guards are threatened by inmates, the particular threat Kelly endured was far beyond the usual threats that Crowley testified about. An examination of

Crowley's testimony shows that while he had experienced threats, they were of a different quality and character from the death threat incident that Kelly described. First, Crowley said that he had never been threatened while in a vulnerable position in the module and that he had "very, very seldom" been threatened by inmates in the normal population where Kelly worked. Crowley testified that the threats to him were not "viable."

Crowley's description of being threatened with a weapon also differed substantially from the incident Kelly was involved in. In response to questioning about whether an inmate had "come directly at [him] ... and threaten[ed][him] with [an] implement," Crowley replied:

> Cell extractions, where we would have to go in and ... and take an inmate out of a room, due to his behavior, and although he is behind a locked door, that door is going to be unsecured and we're going to be going in to the room and removing him from that room, there have been times where an inmate has been holding a pencil or a chicken bone that's been sharpened or a utensil that has been sharpened and threats have been made, that: "If you come in here, I'm going to use this weapon."

A correctional officer threatened by an inmate in a cell can choose not to open the door until he has adequate assistance to disarm the inmate. Kelly had no such choice.

When Kelly was threatened, he was alone and unarmed in Mike Mod, sitting at his desk in the open living area. He was essentially cornered by a strong inmate who had already been convicted of murder. The inmate was armed with a sharpened pencil, which he threatened to use to stab Kelly in the eyes and then stab him to death. Other courts have concluded that sharpened pencils

---

**40.** Minutes, H. Judiciary Comm. Hearing on S.B. 322, 15th Leg., 2d Sess. (Apr. 15, 1988) (comments of Rep. Sam Cotten).

**41.** Minutes, J.H. & S. Labor & Commerce Comm. Hearing on S.B. 322, 15th Leg., 2d Sess. (Jan. 29, 1988) (comments of Sen. Mike Szymanski). A member of the task force that helped draft the legislation also suggested that a police officer who shot an innocent person would suffer

extraordinary and unusual stress. Minutes, H. Judiciary Comm. Hearing on S.B. 322, 15th Leg., 2d Sess. (Apr. 6, 1988) (testimony of Bob Anders).

**42.** 2 LARSON & LARSON, *supra* note 13, § 44.05[4][a].

**43.** *Id.*

can be deadly weapons, particularly when aimed at a victim's eye or neck.[44] Kelly had to wait for others to come to his assistance because he was afraid that if he answered his radio or called for help the inmate would attack him. The uncontroverted evidence presented at Kelly's hearing also revealed that corrections officials treated this threat differently from others, as Kelly testified that he and the prisoner who made the threat were kept apart after the incident. The Board erred in failing to appreciate the unusual and serious nature of the threat to Kelly.

Other courts have concluded that sudden, traumatic incidents qualify as extraordinary stress. In a case involving a PTSD claim by a convenience store clerk after a robbery, the Iowa Supreme Court held that in cases of a "manifest happening of a sudden traumatic nature from an unexpected cause or unusual strain, the legal-causation test is met irrespective of the absence of similar stress on other employees." [45]

Because the Board and the Commission failed to consider the character of the sudden, traumatic threat to Kelly, the Commission erred in concluding that substantial evidence supported the Board's finding that Kelly's stress was not "extraordinary and unusual" in comparison to the stresses encountered by other prison guards. Even accepting that prison guards may be subject to threats, the traumatic death threat that Kelly described in detail constituted "extraordinary and unusual" stress.[46]

▬▬ It is not necessary to remand to the Board for factual findings on the other elements of the compensability of Kelly's claim.[47] There is no evidence that the stress Kelly experienced was related to a personnel action such as an evaluation or termination.[48] All of the doctors who testified indicated that work-related stress caused Kelly's mental health problems. Dr. Early stated that the work-related stress was the predominant cause of Kelly's PTSD. Dr. Matsutani excluded other possible causes of PTSD, such as Kelly's military service. Dr. Lipscomb wrote in her report that Kelly's work stress "could have been sufficient to cause or aggravate an anxiety disorder, not otherwise specified." The State introduced no evidence suggesting that other, non-work-related stressors contributed in any way to Kelly's mental condition, whether it was an anxiety disorder or PTSD.[49] Kelly therefore satisfied all of the

**44.** See People v. Page, 123 Cal.App.4th 1466, 20 Cal.Rptr.3d 857, 863 (2004) (holding that sharpened pencil held to victim's neck was deadly weapon); State v. Workman, 309 N.C. 594, 308 S.E.2d 264, 267–68 (1983) (holding that question whether pencil was deadly weapon was proper jury question); State v. Barragan, 102 Wash.App. 754, 9 P.3d 942, 947 (2000) (holding that pencil was deadly weapon when pencil was aimed at eye, was deflected, and end of pencil became embedded in victim's temple); see also Thomas v. State, 524 P.2d 664, 665 (Alaska 1974) (citing Berfield v. State, 458 P.2d 1008, 1009 (Alaska 1969)) (holding that telephone can be a dangerous weapon); Wynn v. United States, 538 A.2d 1139, 1144 n. 14 (D.C.1988) (noting that pencil can be a dangerous weapon).

**45.** Brown v. Quik Trip Corp., 641 N.W.2d 725, 729 (Iowa 2002).

**46.** See Stevenson v. State, No. M2001–02522–WC–R3–CV, 2002 WL 31431499, at *1 (Tenn.Workers Comp.Panel, October 31, 2002) (remanding workers' compensation claim by prison guard to lower court for determination of whether specific incident of breaking up a prison fight was unusual or abnormal); see also Doe v. S.C. Dep't of Disabilities & Special Needs, 377 S.C. 346, 660 S.E.2d 260, 262 (2008) (holding that new mix of patients that resulted in "significant increase in violent behavior" among patients in state institution was an "extraordinary and unusual condition" in mental-mental claim by licensed practical nurse); Shealy v. Aiken County, 341 S.C. 448, 535 S.E.2d 438, 458 (2000) (holding that knowledge of imminent death threat followed by loss of protection by sheriff's department is "extraordinary condition of employment" for mental-mental workers' compensation claim).

**47.** See State v. Kenaitze Indian Tribe, 83 P.3d 1060, 1071 (Alaska 2004) (concluding that remand not needed because no material issue of fact needed resolution).

**48.** Kelly consistently received good evaluations during his employment at Cook Inlet Pretrial Facility.

**49.** See Eastern Utah Broad. & Workers' Comp. Fund v. Labor Comm'n, 158 P.3d 1115, 1118–19 (Utah App.2007) (construing "predominant cause" to mean that sum of all work-related stress must be greater than sum of non-work-related stress); see also Shealy, 535 S.E.2d at 459 (holding that substantial evidence supported finding that stressors unrelated to work "contributed to or caused" mental injury).

elements required to show that he had suffered an injury as defined by the Alaska Workers' Compensation Act at the time of his injury.[50]

## V. CONCLUSION

For the foregoing reasons, we REVERSE the decision of the Commission affirming the Board's decision that Kelly did not experience extraordinary and unusual stress and REMAND the case to the Commission with instructions to remand the case to the Board for a determination whether Kelly is permanently and totally disabled and whether he is entitled to medical-related travel expenses.

---

**50.** Because we conclude that the Commission erred in deciding that the Board's findings were supported by substantial evidence, we do not address the equitable claims Kelly raised.