BOLGER, Chief Justice.
I. INTRODUCTION
A worker had surgery on his right knee in 2004 after injuring it at work. He returned to work after the surgery and did not consult a doctor about that knee for almost ten years, until he again injured it in 2014 while working for a different employer. Following the 2014 injury he sought to have arthroscopic surgery as his doctor recommended. His 2014 employer disputed its liability for continued medical care, and the worker filed a written claim against the 2014 employer. The *227 Alaska Workers' Compensation Board joined the earlier employer to the claim and decided, after a hearing, that the 2014 work injury was the substantial cause of the worker's current need for medical care, requiring the 2014 employer to pay the cost of treatment for the right knee. The 2014 employer appealed to the Alaska Workers' Compensation Appeals Commission, which decided the Board misapplied the new compensability standard and remanded the case to the Board for further proceedings. The employee petitioned this court for review of the Commission's decision, and we granted review. We reverse the Commission's decision and reinstate the Board's award.
II. FACTS AND PROCEEDINGS
Theodore Morrison injured his right knee while working for SKW Eskimos, Inc. on St. Paul Island in 2004. After Morrison's physician diagnosed meniscus tears, Morrison underwent arthroscopic surgery that removed parts of both his lateral meniscus and medial meniscus. Morrison was released to work shortly after the surgery, but his physician indicated Morrison might later need treatment "for posttraumatic osteoarthritis." SKW Eskimos paid Morrison all workers' compensation related to the 2004 right knee injury.
From Morrison's perspective, the 2004 surgery was successful: he testified that he returned to work after the surgery and performed all of his job duties without significant problems until he injured his right knee in 2014 while working for Alaska Interstate Construction, Inc. He described doing heavy labor from 2004 to 2014, including working on ladders and lifting as much as 90 to 110 pounds. He said he did not see a doctor about his right knee during this time period "[b]ecause there was nothing wrong with it, as far as [he] was concerned." His testimony is supported by a lack of medical records related to his right knee from February 2005, when he had his last postoperative visit, until August 2014.
In late August 2014 Morrison was working for Alaska Interstate Construction at a seasonal job on the North Slope when he twisted his right knee while descending a ladder. He said he thought he had reached the ground but had actually stepped on a piece of angle iron, and when he turned to get off the ladder, he twisted his knee because his boot got caught. He felt a pinch in his right knee and noted some swelling; he reported the injury that day but did not miss work. The physician assistant who examined him at the camp clinic diagnosed a knee strain and prescribed conservative care. Morrison was allowed to return to work with "activity as tolerated." About a week later, Morrison again visited the camp clinic because he still had some pain and was unable to kneel; the physician assistant recommended continued conservative care and suggested he have an orthopedic evaluation before returning to work on the Slope.
Morrison consulted with his doctor, Dr. Dale Trombley, in late September. Dr. Trombley recommended that Morrison use an "elastic sleeve" on the knee and prescribed medication. Dr. Trombley released Morrison to work, but told him that if he still experienced pain after his three-week rotation on the Slope, Morrison should "check in" with Dr. Trombley so he could refer Morrison for an MRI. Morrison visited Dr. Trombley again in November, indicating his knee had "finally been feeling like it [was] getting better," even though he still had some discomfort when he climbed stairs. Dr. Trombley observed no swelling or tenderness in the knee and released Morrison to work without restrictions. Dr. Trombley warned Morrison "that months or even years from now, as a result of this injury, he may end up having a return of pain, discomfort and limited range of motion due ... to meniscus injury."
Morrison returned to Dr. Trombley for his right knee pain in late March 2015, when he told the doctor that the mild pain he had six months before had not resolved and his limping seemed to cause discomfort in his back. Dr. Trombley's examination of the knee showed "tenderness on the medial aspect, especially with outward twisting of the foot." Dr. Trombley referred Morrison for an MRI.
Morrison's imaging studies were interpreted as showing mild to moderate osteoarthritis, a medial meniscus tear, and some cartilage loss. Dr. Trombley referred Morrison to *228 an orthopedic doctor after reviewing the imaging studies, and Morrison saw Dr. Richard Garner. At that time Dr. Garner observed limitations in Morrison's range of motion in his right knee and suggested a second arthroscopic surgery. Morrison wanted to have surgery as soon as possible so he could work through the construction season.
Alaska Interstate Construction arranged an employer's medical evaluation (EME) with Dr. Charles Craven, Jr., an orthopedic surgeon, who examined Morrison in April 2015. Dr. Craven diagnosed Morrison as having osteoarthritis in his right knee, but Dr. Craven's report concluded that the 2014 injury was not the substantial cause of Morrison's current need for medical care. Dr. Craven diagnosed Morrison as having suffered a right knee strain in the 2014 injury, and he gave the opinion that Morrison recovered from that injury in six to twelve weeks. Dr. Craven did not think arthroscopic surgery was reasonable and necessary in any event because of studies showing that this type of surgery was no more effective than physical therapy.
Alaska Interstate Construction controverted all benefits after Dr. Craven wrote his report, and Morrison filed a written workers' compensation claim seeking medical care and temporary total disability (TTD) during his recovery from any surgery. At the same time he filed the written claim, Morrison asked the Board to order a second independent medical evaluation (SIME) because Dr. Trombley disagreed with Dr. Craven about causation and treatment.[1] Alaska Interstate Construction agreed an SIME was needed, but it denied all other parts of Morrison's claim.
Alaska Interstate Construction asked Dr. Craven to consider additional medical records for a supplemental EME report. The additional records did not change Dr. Craven's analysis with respect to the 2014 injury. But Dr. Craven added a new opinion related to causation: Dr. Craven thought the surgery following the 2004 right knee injury was a substantial factor in causing or significantly accelerating Morrison's right knee osteoarthritis, which made it a substantial factor in the 2015 need for medical treatment. Alaska Interstate Construction then asked the Board to join SKW Eskimos as a party to the claim.[2] The Board evidently reopened the 2004 claim and joined the claims.[3] The Board also appointed Dr. Floyd Pohlman as the SIME physician.
Dr. Pohlman examined Morrison in April 2016 and reviewed many medical records. The physical examination indicated Morrison had some pain and a "questionable" test for a meniscus tear. Dr. Pohlman diagnosed Morrison with a right knee strain and moderate degenerative arthritis in his right knee; he listed both as causes of Morrison's need for medical treatment. He said the 2014 injury aggravated the preexisting arthritis, "causing the ... need for treatment." He also thought the 2014 injury caused a permanent change in the preexisting arthritis and further gave the opinion that without the 2014 injury, "it is not likely that the condition would have become symptomatic on that date." Dr. Pohlman identified the 2014 twisting injury as the substantial cause of the need for medical treatment and recommended physical therapy as possible additional treatment. Dr. Pohlman agreed with Dr. Craven that surgery was not necessary at that time.
Morrison was deposed twice, once by each employer. At his October 2015 deposition, Morrison testified about the 2014 accident and said he had continued pain afterward even though he missed no work as a result of it. He described limping a few months after the accident but said he continued to work. He said he stopped working for Alaska Interstate Construction around Thanksgiving because he had "made [his] money for the year *229 and [he] was done." He indicated he had returned to work in February 2015 and had worked at some projects from then until the time of the deposition. He testified that he had continuing pain in his right knee and still felt a pinch in his knee when he twisted to the right or spun on the knee. He continued to take medication for the knee and had been unable to identify specific activities that triggered his symptoms. He said he planned to work if he was able to find something suitable.
At Morrison's second deposition, taken about a year later, he said he had experienced constant pain for 26 months and thought the pain might be "a little worse" then, as he was taking more aspirin. He had a prescription for ibuprofen that he used when the pain was bad enough to make him limp. He had continued his usual pattern of working only as much as he felt necessary and had collected unemployment from February to May 2016. He had worked for two employers at different jobs in the year between the two depositions and did not think this employment had impacted his knee pain.
Dr. Craven testified by deposition. His opinions were overall consistent with his report, although he provided more detail about some issues. Dr. Craven described Morrison as "straightforward," and he said Morrison "gave full and maximal effort" during the examination and had shown "absolutely no pain behaviors." Dr. Craven considered the 2004 injury to be a substantial factor in Morrison's current need for medical treatment because the partial removal of the meniscus accelerated any minor arthritic changes existing at the time of that injury. Dr. Craven thought Morrison probably had suffered symptoms of right knee arthritis prior to the 2014 injury but had not perceived them as such; he attributed this to what he described as a stoic personality. Dr. Craven indicated that even if a person has osteoarthritis, he would not treat that condition until the person shows symptoms.
Dr. Craven insisted that the right knee would have become symptomatic at some point because of its condition, and he agreed that twisting injuries can cause arthritis to become symptomatic even if they do not cause the arthritis itself. He acknowledged that he was "not in a position to refute" Morrison's pain reports, and when asked by SKW Eskimos' attorney whether Morrison's subjective pain symptoms "would be the substantial cause, weighing them only, for the need for further treatment," Dr. Craven agreed that "if subjective symptoms are the only thing that ... substantiate[ ] a substantial cause, then yes."
Dr. Pohlman testified both by deposition and at the later Board hearing. Dr. Pohlman testified that the 2004 injury and related surgery were the substantial cause of Morrison's osteoarthritis and the 2014 injury was not the substantial cause of the arthritic condition itself.[4] But Dr. Pohlman indicated in his deposition that it was "hard to answer" a question about which injury was the substantial cause of Morrison's continuing need for medical treatment. He appeared to agree with Dr. Craven that without the 2004 injury and the osteoarthritis that resulted from the meniscus surgery, the 2014 injury would likely have resolved in a few weeks or months. But Dr. Pohlman also thought the 2014 injury had to have changed something or Morrison would not have become symptomatic at that point. When asked whether the 2014 injury "result[ed] in any pathological changes in the condition of the knee," Dr. Pohlman answered, "I can't say." In terms of which injury was responsible for the need for medical treatment, Dr. Pohlman said, "[I]t's not one [injury] or the other. He had to have osteoarthritis. The 2014 injury aggravated it and made it symptomatic. ... I wouldn't say one is responsible and one isn't. They both are." Like Dr. Craven, Dr. Pohlman testified that doctors treat osteoarthritis only when it is symptomatic.
With respect to treatment options, Dr. Pohlman also thought arthroscopic surgery was probably not indicated because Morrison's symptoms did not suggest that surgery would improve the knee pain. Dr. Pohlman suggested a course of physical therapy, which had not been tried, and thought viscosupplementation *230 (injecting hyaluronic acid into the joint) might be an option if the pain increased. He also said a knee replacement might be indicated in the future as the osteoarthritis progressed and pain increased. Dr. Pohlman accepted that Morrison had in fact been symptom-free in the interval between the 2004 surgery and the 2014 injury. Dr. Pohlman testified that he had treated patients who had no symptoms at all, twisted their knee, and on examination were found to need a total knee replacement because they had "bone-on-bone" contact.
The Board held a hearing on Morrison's claim for continuing medical treatment in December 2016. At the hearing Dr. Pohlman gave an estimate of how he would allocate causation of the injury if he were in an apportionment jurisdiction, saying that he would allot about 80% to 90% to the 2004 injury and 10% to 20% to the 2014 injury. One Board panel member asked Dr. Pohlman whether a person with osteoarthritis would require treatment "if there wasn't a triggering event in cases like this." Dr. Pohlman said the question was "unanswerable" and reiterated that he had "seen people that have completely worn out knees with bone-on-bone contact [who] didn't have any symptoms."
Morrison testified briefly at the hearing, again describing the injuries and the progression of medical treatment following the 2014 accident. He agreed he was having right knee problems that began in 2014 and said he wanted to have the knee "fixed if possible." He affirmed that he had not had pain in the right knee from 2005 to 2014.
The Board decided that the 2014 injury was the substantial cause of Morrison's current need for medical treatment. The Board first noted that Morrison had attached the presumption that his need for medical treatment was compensable and that each employer had rebutted the presumption that it was liable by identifying the other employer as the cause of the need for medical treatment. The Board gave greater weight to the medical opinions of Dr. Pohlman and Dr. Craven than to Dr. Trombley's opinion letter because they had "performed comprehensive medical records reviews." The Board found Dr. Pohlman and Morrison credible. The Board discussed prior cases, including DeYonge v. NANA/Marriott , where we applied to workers' compensation a rule from occupational disability cases that a permanent aggravation of symptoms can be a compensable injury,[5] and a Commission decision that had applied DeYonge to a post-2005 injury.[6] It also discussed another Board decision that had determined an injury could be the substantial cause of a need for medical treatment even if a preexisting condition might significantly contribute.[7] The Board said the last injurious exposure rule[8] had not been abrogated to the extent that "it still operates to prevent apportionment of liability of injury among employers."
The Board decided that the 2014 injury had caused a permanent increase in Morrison's right knee symptoms. It reasoned that because the doctors agreed medical treatment of arthritis is based on symptoms, the 2014 injury was the substantial cause of Morrison's current need for medical treatment even though the doctors were not able to say whether Morrison's right knee was itself damaged after the 2014 injury. It ordered Alaska Interstate Construction to pay for medical care related to Morrison's right knee and pay both SKW Eskimos' and Morrison's attorney's fees.[9]
*231 Alaska Interstate Construction appealed to the Commission, arguing that the Board had erred legally in its application of DeYonge to the case because DeYonge predated the adoption of "the substantial cause" as a compensability standard. Alaska Interstate Construction conceded that the 2005 amendments "may not prohibit an award of benefits based on increased symptoms," but it nonetheless contended that "[t]he application of DeYonge to the current legal causation standard needs to be reevaluated." It contended that the Board erred by focusing on the 2014 injury as the injury that "triggered" Morrison's symptoms and alleged the Board failed to weigh the different causes and determine which one predominated.
Morrison argued in response that the Board had correctly applied Commission precedent to the case, specifically citing City of Seward v. Hansen ,[10] which he argued had rejected the idea that DeYonge was not viable after the 2005 amendments. In response to Alaska Interstate Construction's argument that "the substantial cause" had to be at least a 51% cause, he quoted a letter about the 2005 amendments from the Department of Law to the governor that said, "Because 'the substantial cause' is determined in relation to employment and other causes, it follows that the employment may be 'the substantial cause' but not necessarily 'more than 50 percent.' " He argued that because Dr. Pohlman had testified that "doctors do not do surgery on a knee until there is pain," the 2014 injury, which caused Morrison's arthritic right knee to become painful, was the substantial cause of Morrison's current need for medical treatment.
SKW Eskimos agreed with Morrison that the Board had correctly applied the law, contending that DeYonge remained valid after adoption of "the substantial cause" as a standard for compensability. SKW Eskimos argued that the medical testimony at the hearing was contrary to Alaska Interstate Construction's interpretation of the evidence. SKW Eskimos also maintained that the Board had properly applied the last injurious exposure rule.
The Commission reversed the Board's decision and remanded the case for the Board "to examine in further detail the relationship between the first (2004) injury and the second (2014) injury to determine the substantial cause for any ongoing medical treatment." The Commission discussed both legal and factual reasons for its decision.
The Commission identified "keeping workers' compensation insurance premiums affordable for employers" as "an important purpose" of the 2005 amendments. The Commission concluded that the legislature intended to contract coverage under the Alaska Workers' Compensation Act (Act) when it changed the causation standard. It then summarized cases related to aggravations, including DeYonge , and others related to the last injurious exposure rule. The Commission wrote, "The question that remains is whether an increase in symptoms meets the definition of 'the substantial cause' or whether the underlying condition must be changed before the increase in symptoms becomes 'the substantial cause.' "
The Commission thought the Board had "ignored" Dr. Pohlman's testimony about apportionment and also said that "hastening the need for treatment does not necessarily make it the substantial cause." The Commission interpreted Dr. Pohlman's testimony as "seemingly agree[ing that] the substantial cause for treatment of the underlying condition was the 2004 injury."
The Commission concluded its discussion as follows:
The Board erred in relying on pre-2005 case law for the proposition that an onset of symptoms following the 2014 injury is sufficient to define it as the substantial cause for all ongoing medical treatment without following the requirement of AS 23.30.010(a) to weigh all relevant causes. A remand is necessary for the Board to weigh all factors before determining which injury is the substantial cause of future and ongoing medical treatment.
*232 We granted Morrison's petition for review of the Commission's decision.
III. STANDARD OF REVIEW
In an appeal from the Commission, we review the Commission's decision and not the Board's.[11] "We apply our independent judgment to questions of law that do not involve agency expertise, including issues of statutory interpretation" and "interpret a statute 'according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its purpose.' "[12]
IV. DISCUSSION
This case presents questions related to the 2005 amendments to the Act. The Act creates a presumption that a claim falls within the Act's coverage.[13] Before 2005, application of this presumption followed a three-step analysis developed through case law.[14] In 2005 the legislature modified the standard for compensability of injuries and set out steps for the Board to use in evaluating compensability.[15] This case involves only the last step of the compensability analysis: no party has raised an issue related to attaching or rebutting the presumption, so we assume without deciding that Morrison attached the presumption and that the two employers rebutted that presumption.
Under our prior case law, when an employer rebutted the presumption that an injury was compensable, the employee had the burden of proving that the employment was a substantial factor in causing the disability or need for medical care.[16] The legislature in 2005 changed the compensability standard to "the substantial cause"[17] to reduce the number of compensable claims. Alaska Statute 23.30.010(a) now provides in relevant part:
[C]ompensation or benefits are payable under this chapter for disability or death or the need for medical treatment of an employee if the disability or death of the employee or the employee's need for medical treatment arose out of and in the course of the employment. ... When determining whether or not the death or disability or need for medical treatment arose out of and in the course of the employment, the board must evaluate the relative contribution of different causes of the disability or death or the need for medical treatment. Compensation or benefits under this chapter are payable for the disability or death or need for medical treatment if, in relation to other causes, the employment is the substantial cause of the disability or death or need for medical treatment.
In this case we must also consider the interaction between the new compensability standard and two rules derived from our precedent that are used in Alaska workers' compensation law: the last injurious exposure rule[18] and the rule that an increase in symptoms can constitute a compensable injury.[19]
The facts in this case are largely undisputed, and even though the doctors came to different conclusions, they agreed about *233 many significant facts. No one disputed that Morrison injured his right knee at his two jobs. Dr. Craven and Dr. Pohlman, the doctors whose opinions the Board gave more weight, agreed that the 2004 injury and resulting surgery accelerated Morrison's mild right knee osteoarthritis so that the 2004 injury was a substantial factor contributing to the need for medical treatment. (In fact Morrison's surgeon warned him of this possibility in 2004.) Dr. Craven and Dr. Pohlman also agreed that doctors do not treat osteoarthritis in the absence of symptoms, and they agreed the 2014 injury caused some increase in Morrison's right knee symptoms. Neither doctor doubted Morrison's reports that he had perceived no symptoms from 2005 to 2014 or that he continued to experience right knee pain after the 2014 injury, although they differed in the way they interpreted this information. The parties dispute whether the Board correctly applied the new causation standard and whether the Commission correctly construed the statute when it decided to remand the case to the Board.
A. The 2005 Amendments To The Alaska Workers' Compensation Act Did Not Change The Type Of Injury That May Be Compensable.
We first consider whether the 2005 amendments modified the rule we adopted in DeYonge .[20] There we applied to a workers' compensation claim a rule from occupational disability cases: an aggravation of symptoms can be a compensable injury even in the absence of an aggravation in the underlying disease.[21] Morrison asserts that the Commission "seems to take [the] position that the DeYonge analysis does not apply under the substantial cause test," citing part of the Commission decision. Alaska Interstate Construction contends that DeYonge needs to be reexamined in light of the new standard of compensability, but at oral argument before us, it agreed that aggravations producing only increased symptoms can still be compensable injuries. SKW Eskimos argues that recent Commission decisions essentially overrule DeYonge ; in its view the Commission has "completely change[d] the compensability standard and only allows the compensability of work injuries that have an objective or pathological worsening."
We agree with the parties that the legislature did not abrogate DeYonge when it amended the compensability standard in 2005. The Commission apparently questioned whether the rule in DeYonge was still valid, writing: "Thus, the question now is whether an aggravation of symptoms is sufficient to find an employer liable for ongoing medical benefits." It also wrote: "The question that remains is whether an increase in symptoms meets the definition of 'the substantial cause' or whether the underlying condition must be changed before the increase in symptoms becomes 'the substantial cause.' "
In our view the Commission framed the issue incorrectly. Symptoms frequently prompt people to seek medical care, and an increase in symptoms may be a reason medical treatment is necessary - indeed the doctors in this case agreed that symptoms are the only reason doctors treat osteoarthritis. But the Commission's question essentially looks at what qualifies as an injury, which is not how the legislature chose to reduce the number of potentially compensable claims.
The statutory language does not require the Board to look at the type of injury in identifying the substantial cause of the need for medical treatment. Alaska Statute 23.30.010(a) requires the Board to "evaluate the relative contribution of different causes of the ... the need for medical treatment." That subsection then provides, "Compensation or benefits under this chapter are payable for ... medical treatment if, in relation to other causes, the employment is the substantial cause of the ... need for medical treatment."[22] When read together, these sentences do not reflect an instruction to consider the type of injury when evaluating compensability; instead, they require the Board to look at the causes of the injury or symptoms to determine whether "the employment" was a cause important enough to bear *234 legal responsibility for the medical treatment needed for the injury.
Our reading of the statute is supported by the legislative history. During consideration of the 2005 amendments, one proposal would have amended the definition of "injury" in the Act to exclude from coverage an "aggravation, acceleration, or combination with a preexisting condition unless the employment is the major contributing cause of the disability or need for medical treatment."[23] Even though the proposal would have redefined "injury" for purposes of the Act, the language in this proposal, like the amendment that was ultimately adopted, focused on the degree to which "the employment" contributed to the injury. It did not remove from coverage certain classes of injury or disease, nor did it require a pathological change in a condition in order to establish compensability. The parties point to no legislative history suggesting an intent in the final bill to exclude injuries that cause increased symptoms, the Commission cited none, and our review of the legislative history shows no discussion of DeYonge and no intention to categorically exclude a class of injuries. The legislature is presumed to be "aware of existing case law when it enacts or modifies the law,"[24] so the lack of any discussion of DeYonge in the legislative history together with the legislature's rejection of a change in the definition of "injury" indicate that the legislature did not intend to abrogate DeYonge .
As we noted earlier, the doctors here agreed that osteoarthritis is only treated when it becomes symptomatic. They also agreed that Morrison's symptoms related to his right-knee osteoarthritis became sufficiently troublesome to require medical attention only after the 2014 injury.[25] The Board needed to consider what factors contributed to the pain associated with the osteoarthritis. In Morrison's case the only factors identified were his 2014 injury and his 2004 injury (and related surgery). The Board thus correctly concluded that the two injuries were the causes it needed to consider in determining "the substantial cause" of Morrison's need for medical treatment.
B. The Legislature Modified The Last Injurious Exposure Rule.
Morrison contends that the last injurious exposure rule was not changed by the 2005 amendments, quoting legislative hearing testimony to the effect that the change in the compensability standard did not affect the last injurious exposure rule. Alaska Interstate Construction argues that the Board erroneously applied the last injurious exposure rule and imposed full liability on it because Morrison's later injury happened during his employment. Before the Board and the Commission, SKW Eskimos raised the last injurious exposure rule as a reason for imposing liability on Alaska Interstate Construction, but it does not repeat that argument in its brief before us.
According to the Commission, "[t]he Board found Alaska Interstate [Construction] to be liable for ongoing medical benefits under both the last injurious exposure doctrine and the substantial cause definition." The Commission summarized the last injurious exposure doctrine and indicated AS 23.30.010(a) had changed the causation standard, but it did not identify how the Board used the last *235 injurious exposure rule to impose liability for Morrison's medical care on Alaska Interstate Construction.
As a general matter, the last injurious exposure rule applies in the workers' compensation context when successive work injuries with different employers contribute to a worker's disability or need for medical care.[26] The rule "imposes full liability on the employer at the time of the most recent injury that bears a causal relationship to the disability."[27] We adopted the last injurious exposure rule in Ketchikan Gateway Borough v. Saling because we considered it "more compatible with existing Alaska law."[28] We recognized that it would cause some inequity, but we considered the rule easier to administer than apportionment and thought payments from the second injury fund would offset some of the inequity.[29]
Alaska Statute 23.30.010(a) now requires the Board to "evaluate the relative contribution of different causes of ... the need for medical treatment" and determine "if, in relation to other causes, the employment is the substantial cause of the ... need for medical treatment." The statutory language itself does not clarify whether "the employment" refers to employment as a whole - as it might if it were concerned with comparing all employment-related causes with all non-employment-related causes - or if it refers to a specific employment relationship existing at the time of a particular injury. But the legislative history strongly suggests that the legislature intended to permit later employers to try to shift liability to an earlier employer, thus modifying the rule we adopted in Saling .
Morrison is correct that Kristin Knudsen, an assistant attorney general who helped write the relevant statutory language,[30] told the Free Conference Committee that the statutory language did not "get[ ] rid of the last injurious exposure doctrine" and that "it doesn't affect the last injurious exposure doctrine."[31] But she also said that the language would "provide an opportunity for employers to shift, sometimes, when they may have been a substantial factor to another employer who was the substantial factor [sic]."[32] The legislature in 2005 retained statutory provisions directly related to the last injurious exposure rule, continuing to require one employer to pay the attorney's fees of another employer when the two employers dispute liability for compensation.[33] We interpret the language and legislative history to mean that the 2005 amendments modified the last injurious exposure rule to allow the Board to impose full liability for an injury on an earlier employer but did not adopt apportionment - the alternative we rejected in Saling .[34]
Alaska Interstate Construction relies on the comments Knudsen made about shifting responsibility to argue that Morrison's case "is exactly the type of situation sought to be prevented." But allowing an earlier employer to be found responsible does not require the earlier employer to be found responsible: the possibility that a later employer may shift responsibility for payment to an earlier employer does not compel the *236 Board to do so. In this case the Board relied on medical testimony to identify employment with both Alaska Interstate Construction and SKW Eskimos as possible causes of Morrison's need for medical treatment. The Board decided after weighing the evidence that the injury with Alaska Interstate Construction was the substantial cause of the medical treatment Morrison needed at the time of the hearing.
Alaska Interstate Construction then focuses on Knudsen's testimony that "initial treatment of injuries that occur on the job" would be compensable, even in the presence of a preexisting condition.[35] Alaska Interstate Construction asserts that it paid for initial treatment of Morrison's right knee and claims that "at some point, the substantial cause for the need for ongoing medical treatment" became Morrison's preexisting injury. This is a fact-dependent issue. We see nothing in the statutory language or legislative history to support a legal rule that in all cases a later employer can shift responsibility for medical care to an earlier employer.[36] The legislature modified the last injurious exposure rule to permit a later employer to argue that an earlier employer should bear legal responsibility, but the Board remains able to impose liability on a later employment that is a causal factor if the Board determines the later employment is "the substantial cause" of the need for medical treatment.
We see no indication that the Board incorrectly applied the last injurious exposure doctrine in its decision here. It carefully considered how the two injuries contributed to Morrison's need for medical care. It discussed in some detail the medical testimony and imposed liability on Alaska Interstate Construction because in the Board's view employment with Alaska Interstate Construction was the cause of the onset of the symptoms that led to Morrison's need for medical care. The Board's decision does not suggest that it imposed liability simply because Alaska Interstate Construction was the last employment with a causal relationship to Morrison's right knee condition.
C. The Board Correctly Applied The New Causation Standard When It Determined The 2014 Injury Was The Substantial Cause Of The Need For Medical Treatment At The Time Of The Hearing.
The Commission decided that the Board had misapplied the new causation standard and erred in its application of "pre-2005 case law," and it remanded the case to the Board "to weigh all factors before determining which injury is the substantial cause of future and ongoing medical treatment." The Commission evidently interpreted the Board's decision as "just look[ing] to the last incident and ascrib[ing] all ongoing need for medical treatment to it." The Commission did not disavow or overrule any of its previous decisions.
We have not considered the meaning or application of the new compensability standard at the final stage of the presumption analysis.[37] Here only two causes were identified for purposes of evaluating the substantial cause of Morrison's need for medical treatment - employment with SKW Eskimos and with Alaska Interstate Construction. The Board had to decide which was "the substantial cause" of the need for medical treatment, and the Board found that employment with Alaska Interstate Construction was the most important causal factor.
*237 Before us the main dispute related to causation is the extent to which a "triggering" event (to use Alaska Interstate Construction's term) can be "the substantial cause" of the need for ongoing medical treatment. Alaska Interstate Construction contends that the Board's analysis was flawed because it placed too much weight on the triggering event and failed to consider the extent to which the 2004 injury contributed to the present need for medical treatment. SKW Eskimos takes the position that the Board's analysis was legally and factually sound. Morrison contends that the Board is now required "to look at the various causes and determine if the accident is the more important cause." He argues that the question "is whether or not the work related condition was the substantial factor in the need for medical treatment, not necessarily the substantial factor for an employee's over-all condition."
We construe a statute "according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its purpose."[38] In relevant part, AS 23.30.010(a) provides:
When determining whether or not the death or disability or need for medical treatment arose out of and in the course of the employment, the board must evaluate the relative contribution of different causes of the disability or death or the need for medical treatment. Compensation or benefits under this chapter are payable for the disability or death or need for medical treatment if, in relation to other causes, the employment is the substantial cause of the disability or death or need for medical treatment.
The statutory language is not complex: it specifies that the Board must consider different causes of the benefit sought and the extent to which each cause contributed to the need for the specific benefit at issue; the Board must then identify one cause as "the substantial cause." The legislature did not define either "substantial" or "the substantial cause,"[39] but the legislative history shows an intent to narrow the compensability standard developed in our previous case law.
In the context of workers' compensation cases where an employee's disability or need for medical treatment resulted from an aggravation of a preexisting injury or had more than one possible cause, we previously adopted from tort law the "substantial factor" test.[40] Under that test a worker was required to prove that work was both a but-for (or factual) cause of the disability and a proximate (or legal) cause.[41] The current statutory language changes that standard.
As the Commission noted in its decision, the current statutory language came about after an earlier attempt to amend the statute failed. The initial attempt to amend the compensability standard was made in the Senate Judiciary Committee, which proposed changing the definition of "injury" in AS 23.30.395(17) to exclude "aggravation, acceleration or combination with a preexisting condition unless the employment is the major contributing cause of the disability or need for medical treatment."[42] This language was removed from the legislation in the House.[43] The Free Conference Committee on the bill rejected an amendment that reincorporated this definition of "injury" into the legislation.[44] It also rejected a variation on that amendment, which would have said, "Determining the major contributing cause requires the evaluation of the relative contribution of different causes of disability or death of the employee or the employee's need for medical *238 treatment and finding the cause that is the primary cause."[45] Rather than adopt a standard that used the term "major contributing cause," which one witness indicated would be a 51% or greater cause,[46] the legislature instead chose "the substantial cause" as the new standard for compensability. Legislators agreed that "the substantial cause" was a lower standard than "the major contributing cause."[47] The legislature's failure to adopt a specific measure is an indication of what the legislature did not intend when enacting a statute,[48] so we conclude that the legislature did not intend to require that the substantial cause be a 51% or greater cause, or even the primary cause, of the disability or need for medical treatment.
Turning to the language the legislature adopted, the term "substantial" has nine definitions in Black's Law Dictionary, three of which appear relevant in that they are linked to the ideas of materiality and importance: (1) "[o]f, relating to, or involving substance; material < substantial change in circumstances>"; (2) "[r]eal and not imaginary; having actual, not fictitious, existence < a substantial case on the merits>"; and (3) "[i]mportant, essential, and material; of real worth and importance < a substantial right>."[49] Consistent with these definitions, the language of AS 23.30.010(a) requires the Board to consider the causes of the need for medical treatment or disability and decide (after comparing the identified causes) which in its judgment is the most important or material cause related to that benefit.
The testimony of Knudsen, the assistant attorney general who helped draft the statutory language, supports this interpretation. In addition to noting that "the substantial cause" was a lower standard than "the major contributing cause,"[50] Knudsen testified that "the substantial cause" contemplated the existence of many causes, "the substantial cause being whatever constitutes substantial in the minds of reasonable men."[51] She further indicated that the language would require the Board to evaluate the different causes of the benefit requested in order to determine whether work was the substantial cause of the need for that specific benefit; the comparison the Board was to make was among the causes identified, not in isolation or in comparison to an abstract idea.[52]
The new standard leaves the Board discretion to choose among the identified causes the most important or material cause with respect to the benefit sought. Because the standard remains flexible it is necessarily fact-dependent. The Commission decided the Board had legally erred by relying on pre-2005 case law about aggravations of symptoms and by failing "to weigh all relevant causes." We held above that the rule in DeYonge remains viable and now consider whether *239 the Board weighed all relevant causes of Morrison's need for medical treatment at the time of the hearing. We hold that it did so.
The Commission agreed that Morrison's osteoarthritis"may have been aggravated by the 2014 injury," but it pointed out facts it considered more important and remanded the case to the Board "for the Board to weigh all factors" in determining the substantial cause of Morrison's need for medical treatment. The Commission did not articulate a new standard for the Board to apply. Instead, the Commission provided its own interpretation of Dr. Pohlman's testimony and made factual assertions about the evidence without providing record citations to support these assertions.[53] Weighing the evidence is not the Commission's role: the Act makes the Board's credibility findings "binding" on the Commission and requires the Commission to uphold the Board's findings "if supported by substantial evidence in light of the whole record."[54] "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[55] The Commission has previously decided it will "not consider whether the board relied on the weightiest or most persuasive evidence, because the determination of the weight to be accorded evidence is the task assigned to the board, not the commission."[56] Nor will the Commission "reweigh the evidence or choose between competing inferences, as the board's assessment of the weight to be accorded conflicting evidence is conclusive."[57]
The Commission wrote that the Board "ignored" Dr. Pohlman's testimony about responsibility based on a "pathological approach." We disagree with the Commission's assessment. Dr. Pohlman's testimony based on the "pathological approach" was in response to a question about how he would assign responsibility if he were in an apportionment jurisdiction. The Board discussed this testimony but decided it was not legally determinative. We agree with the Board that apportionment testimony is not legally determinative under the new causation standard, even though this testimony may be a fact the Board weighs when it determines compensability. The Board considered the testimony but decided that other parts of Dr. Pohlman's testimony were more relevant to the issues before it. This was consistent with the Board's role.
Alaska Interstate Construction maintains it fulfilled its duty to provide the initial treatment after the injury. It argues that the five-month gap in Morrison's treatment after the 2014 injury shows that he in fact recovered from that injury so that any later need for medical treatment was not its responsibility because it was no longer the substantial cause. This is an argument about the inferences to be drawn from the evidence. The Board interpreted the medical testimony differently, as it was permitted to do, and Morrison's testimony, which the Board found credible, supports the Board's interpretation. Because the doctors here agreed that symptoms are what necessitates treatment in osteoarthritis, it was not unreasonable to determine that Morrison's 2014 injury, which prompted him to seek medical treatment for the right knee for the first time in almost 10 years, was the most important cause of his need for medical treatment at the time of the hearing. The medical treatment discussed in testimony was physical therapy followed by viscosupplementation if *240 needed and ultimately a possible knee replacement.
Alaska Interstate Construction contends that the Board erred legally by "applying a test of what was 'the last straw,' or what 'triggered' the immediate need for treatment" because it "directly subverts the legislative attempt to heighten the standard for compensability." We do not view the Board's decision so narrowly. Based on the medical testimony, the Board identified two possible causes of Morrison's need for medical treatment at the time of the hearing. It then considered the extent to which the two causes contributed to that need and decided the 2014 injury was the more important cause of the need for treatment then. The legislature gave the Board discretion to assign a cause based on the evidence before it. The Board did here what the statute directs.
V. CONCLUSION
We REVERSE the Commission's decision and REMAND the case with instructions to reinstate the Board's award.

Dr. Trombley had written a letter giving the opinion that the 2014 injury was the substantial cause of Morrison's need for medical treatment.

See 8 Alaska Administrative Code (AAC) 45.040(d) (2011) ("Any person against whom a right to relief may exist should be joined as a party.").

See 8 AAC 45.040(k) (requiring Board to notify parties of master case number when claims are joined). An attorney entered an appearance for SKW Eskimos in the 2004 claim in May 2016, and the hearing transcript indicates that the 2014 claim number is the master case number.

Dr. Pohlman identified only the 2004 and 2014 injuries as causal factors in Morrison's condition, rejecting the suggestion that the underlying osteoarthritis constituted a third discrete cause.

1 P.3d 90 (Alaska 2000).

City & Borough of Juneau v. Olsen , AWCAC Dec. No. 185 (Aug. 21, 2013).

Sarmiento-Mendoza v. State , AWCB Dec. No. 14-0122 (Sept. 2, 2014).

When an employee's disability or need for medical treatment is caused by more than one work-related injury, the last injurious exposure rule imposes compensation liability on the last employment that was a causal factor in the disability or need for medical treatment. Ketchikan Gateway Borough v. Saling , 604 P.2d 590, 595 (Alaska 1979).

When two employers dispute which one is liable for compensation, the employer who is found liable is required to reimburse the other employer's attorney's fees. See AS 23.30.155(d) (including attorney's fees and costs in reimbursement Board can order between employers when each contends the other is liable); Bouse v. Fireman's Fund Ins. Co. , 932 P.2d 222, 241 (Alaska 1997) (interpreting AS 23.30.155(d) with regard to requirement that one employer reimburse the other's attorney's fees).

AWCAC Dec. No. 146 (Jan. 21, 2011).

Alaska Airlines, Inc. v. Darrow , 403 P.3d 1116, 1121 (Alaska 2017).

Vandenberg v. State, Dep't of Health & Soc. Servs. , 371 P.3d 602, 606 (Alaska 2016) (quoting Louie v. BP Expl. (Alaska), Inc. , 327 P.3d 204, 206 (Alaska 2014) ).

AS 23.30.120(a)(1).

See Huit v. Ashwater Burns, Inc. , 372 P.3d 904, 906-07 (Alaska 2016) (summarizing pre-2005 presumption analysis).

AS 23.30.010(a).

Ketchikan Gateway Borough v. Saling , 604 P.2d 590, 597-98 (Alaska 1979). This standard was derived from tort law. Id. at 598.

Ch. 10, § 9, FSSLA 2005.

Saling , 604 P.2d at 597. The last injurious exposure rule is the majority rule in the United States. 14 Arthur Larson et al., Larson's Workers' Compensation Law § 153.02[1] (2018) (noting that last injurious exposure rule "is the majority rule in successive insurer cases").

See DeYonge v. NANA/Marriott , 1 P.3d 90, 96 (Alaska 2000) (holding that employment that worsens symptoms can be an aggravation "even when the job does not actually worsen the underlying condition").

Id .

Id.

AS 23.30.010(a).

Minutes, Sen. Judiciary Standing Comm. Hearing on C.S.S.B. 130(L&C), 24th Leg., 1st Sess. 10:35:54 (Apr. 7, 2005). The Free Conference Committee discussed but ultimately rejected a similar proposal using the major contributing cause standard. Minutes, Free Conference Comm. on S.B. 130 Hearing on C.C.S.S.B. 130(fld H), 24th Leg., 1st Special Sess. 5:40:15-5:42:02, 9:12:18-9:24:24 (May 20, 2005).

Huit v. Ashwater Burns, Inc. , 372 P.3d 904, 913 (Alaska 2016).

In this case the Board wrestled with an additional medical question that it found unnecessary to resolve because of DeYonge : did the 2014 injury cause more than just an increase in symptoms? The doctors who examined Morrison disagreed in their interpretations of the MRI, as the Board explained. Dr. Pohlman was unable to rule out the possibility that Morrison had suffered some permanent change in his knee condition due to the 2014 injury: when asked whether the 2014 injury "result[ed] in any pathological changes in the condition of the knee," Dr. Pohlman answered, "I can't say." Dr. Craven acknowledged that twisting a knee can cause a meniscus tear as well as an aggravation of underlying osteoarthritis, even though he diagnosed only a strain in Morrison's case.

Larson , supra note 18, § 153.02[1].

Ketchikan Gateway Borough v. Saling , 604 P.2d 590, 595 (Alaska 1979). Another approach is to apportion liability among the employers. Id. ; see also Larson , § 153.03[1].

604 P.2d at 595.

Id. at 596-98. The second injury fund is still operative. See AS 23.30.205. The fund provides partial reimbursement to employers for some compensation when a worker has one of a list of preexisting conditions; the employer must have a written record showing it knew of the condition. Id.

Statement of Sen. Gene Therriault, at 1:19:18-1:19:23, Hearing on C.C.S.S.B. 130(fld H) Before Free Conference Comm. on S.B. 130, 24th Leg., 1st Special Sess. (May 21, 2005).

Id. testimony of Kristin Knudsen, Assistant Att'y Gen. at 1:49:31-1:49:42.

Id. at 1:49:44-1:50:09.

AS 23.30.155(d).

Apportionment was mentioned in the Free Conference Committee hearings, but no amendment related to apportionment was considered then. Minutes, Free Conference Comm. on S.B. 130 Hearing on C.C.S.S.B. 130(fld H), 24th Leg., 1st Special Sess. 6:09:56 (May 20, 2005).

Testimony of Kristin Knudsen, Assistant Att'y Gen. at 1:50:08-1:50:44, Hearing on C.C.S.S.B. 130(fld H) Before Free Conference Comm. on S.B. 130, 24th Leg., 1st Special Sess. (May 21, 2005).

See Senate Floor Debate on S.B. 130 at 11:28-11:37 (May 24, 2005) (Statement of Sen. Gene Therriault) (indicating that last employer in series of work-related injuries would "not necessarily ... get stuck with the entire bill"); id. at 12:0714:07 (Statement of Sen. Ralph Seekins) (stating that Board could shift responsibility to earlier employer under new causation standard).

We have previously looked at the impact of the amendments on the second stage of the presumption analysis. See Huit v. Ashwater Burns, Inc. , 372 P.3d 904, 919 (Alaska 2016) (holding that 2005 amendments did not abrogate negative-evidence test to rebut the presumption of compensability).

Id. at 907-08.

See AS 23.30.395.

Fairbanks N. Star Borough v. Rogers & Babler , 747 P.2d 528, 531-32 (Alaska 1987).

Id.

Minutes, Sen. Judiciary Standing Comm. Hearing on C.S.S.B. 130(L&C), 24th Leg., 1st Sess. 10:35:54 (Apr. 7, 2005).

See Minutes, House Labor & Commerce Standing Comm., Hearing on C.S.S.B. 130(FIN) am, 24th Leg., 1st Sess. 5:50:20 (May 4, 2005).

Minutes, Free Conference Committee on S.B. 130 Hearing on C.C.S.S.B. 130(fld H), 24th Leg., 1st Special Sess. 5:40:15-5:42:02, 9:12:18-9:24:24 (May 20, 2005).

Id. at 9:12:18-9:24:24.

Testimony of Paul Lisankie, Director, Div. of Workers' Comp. at 10:37:4010:38:47, Hearing on C.S.S.B. 130(L&C) Before the Sen. Judiciary Standing Comm., 24th Leg., 1st Sess. (Apr. 7, 2005).

Comments of Sen. Gene Therriault at 1:32:03-1:32:10 ("a much lower standard"), Comments of Rep. Tom Anderson at 1:32:51-1:32:55 ("a lower threshold"), Hearing on C.C.S.S.B. 130(fld H) Before the Free Conference Comm. on S.B. 130, 24th Leg., 1st Special Sess. (May 21, 2005) (commenting that fewer cases would fall through the cracks than with major contributing cause); Comments of Rep. Eric Croft at 15:40-16:47 (describing "the substantial cause" as falling in between "a substantial factor" and "the major contributing cause"), Comment of Rep. Tom Anderson at 51:3852:27 (supporting the substantial cause and not major contributing cause), House Floor Debate on S.B. 130 24th Leg., 1st Special Sess. (May 22, 2005).

See City of Dillingham v. CH2M Hill Nw., Inc. , 873 P.2d 1271, 1276-77 (Alaska 1994) (construing legislature's rejection of amendment allowing limitation of liability clauses as intent to prohibit such clauses).

Substantial , Black's Law Dictionary (10th ed. 2014).

Testimony of Kristin Knudsen, Assistant Att'y Gen. at 1:32:10-1:32:51, Hearing on C.C.S.S.B. 130(fld H) Before the Free Conference Comm. on S.B. 130, 24th Leg., 1st Special Sess. (May 21, 2005).

Id. at 1:32:10-1:32:31.

Id. at 1:21:12-1:23:22 (indicating that standard was only new in the sense that it required the Board to consider the different causes to determine substantiality).

For example, the Commission wrote that Dr. Pohlman indicated Morrison would need ongoing medical treatment from the 2004 injury without the 2014 injury. Dr. Pohlman indicated that Morrison had to have suffered both injuries to need medical treatment at the time of the Board hearing. And when a Board panel member asked Dr. Pohlman whether Morrison would require treatment in the absence of a triggering event, the doctor answered, "It's just impossible to answer."

AS 23.30.128(b).

Pietro v. Unocal Corp. , 233 P.3d 604, 610 (Alaska 2010), quoted in ARCTEC Servs. v. Cummings , AWCAC Dec. No. 155 at 11 (Aug. 17, 2011), http://labor.state.ak.us/WCcomm/memos-finals/D_155.pdf.

McGahuey v. Whitestone Logging, Inc. , AWCAC Dec. No. 054 at 6 (Aug. 28, 2007), http://labor.state.ak.us/WCcomm/memos-finals/F_07-054.pdf.

Id. (citing AS 23.30.122 ).