*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JOSEPH TRAUGOTT, | ) | |
| | ) | Supreme Court No. S-17126 |
| Appellant, | ) | |
| | ) | Alaska Workers' Compensation |
| v. | ) | Appeals Commission No. 17-015 |
| | ) | |
| ARCTEC ALASKA, | ) | O P I N I O N |
| | ) | |
| Appellee. | ) | No. 7456 – June 12, 2020 |
| | ) | |

Appeal from the Alaska Workers' Compensation Appeals Commission.

Appearances: Eric Croft and James Croft, The Croft Law Office, Anchorage, for Appellant. Matthew T. Findley and Laura C. Dulic, Ashburn & Mason, P.C., Anchorage, for Appellee.

Before: Winfree, Stowers, Maassen, and Carney, Justices. [Bolger, Chief Justice, not participating.]

CARNEY, Justice.

## I. INTRODUCTION

A worker with diabetes and a related foot condition developed an infection in his foot while working at a remote site. He required extensive medical treatment for his foot and has not worked since developing the infection. The Alaska Workers' Compensation Board decided the worker's disability and need for medical treatment

were compensable based on an expert opinion that work was the sole cause of the condition's acceleration even if work was not the most significant cause of the worker's overall condition. The Alaska Workers' Compensation Appeals Commission reversed the Board's decision because in the Commission's view the Board had asked the expert misleading questions. The Commission then concluded, based on a different opinion by the same expert, that the worker had not provided sufficient evidence to support his claim. The worker appeals, raising issues about the interpretation of the new causation standard adopted in the 2005 amendments to the Alaska Workers' Compensation Act (Act) and its application to his case. We reverse the Commission's decision and remand for reinstatement of the Board's award.

## II.    FACTS AND PROCEEDINGS

Joseph Traugott, a long-time Alaska resident who moved to Amarillo, Texas in 2008, began to work for ARCTEC Alaska in March 2013, maintaining heating and ventilation systems at remote sites in Alaska. Before he was hired Traugott was cleared to work in a preemployment physical examination; he disclosed that he had preexisting diabetes. ARCTEC sent Traugott to Tin City, near Nome, where he worked six ten-hour days plus extra hours when needed, with Sundays off. He worked mostly on ladders because the systems needing maintenance were overhead.

The underlying legal question in this case requires us to consider two concepts: what the Board called the "eggshell skull doctrine" and the application of the new causation standard — "the substantial cause" — to a preexisting non-work-related medical condition. Traugott is disabled because a bone in his ankle, the talus, essentially disintegrated, requiring extensive treatment and surgery. The question before the Board was whether a work-related injury was "the substantial cause" of Traugott's disability and need for medical care. Because the medical aspects of this case are complicated, we summarize medical testimony presented to the Board to provide context.

### A. Medical Conditions

Traugott had a number of preexisting health problems, but diabetes is the most important to his workers' compensation case. Traugott was diagnosed with diabetes many years before he began to work for ARCTEC; he also developed peripheral neuropathy, a complication of diabetes. In addition to interfering with feeling or sensation, peripheral neuropathy affects the skin. According to Dr. Jerry Grimes, Traugott's orthopedic surgeon, patients with peripheral neuropathy do not produce oils on the skin, making them more vulnerable to skin damage, which in turn can allow bacteria to enter the body. Diabetics also have problems with wound healing.

Traugott also had Charcot foot, a neuropathy-related condition that causes bone loss and can lead to foot deformities. Only a small percentage of diabetics develop Charcot foot, and the causal factors are not well understood. Dr. Grimes testified that Charcot foot occurs in "episodic flare[s] of inflammation in a joint or bone," but it is not degenerative. During an episode "the foot gets red, hot, swollen" and looks as though it might be infected, but "there's no organism present." The disease can flare more than once.

As Dr. Grimes described it, "during this inflammation stage, the bones begin to just crumble" and "fall apart." If Charcot foot is detected early enough and the area is immobilized, the bones may stabilize. Charcot foot can cause deformities that result in "an abnormal weight-bearing surface, . . . put[ting] part of the foot at risk" because only parts of the feet are designed to be weight-bearing. When a non-weight-bearing surface must bear weight, the skin can get thicker and form a callus, but a callus "may be aggravating the risk of a[n] ulceration" rather than preventing one.

Traugott developed osteomyelitis, a bone infection, which he contended was introduced into his foot via a blister caused by his work on ladders. Charcot foot has

symptoms that are similar to osteomyelitis; apparently it is nearly impossible to distinguish Charcot foot from osteomyelitis on imaging studies.

The doctors who testified agreed about many aspects of the case, but they had different opinions about the role osteomyelitis and Charcot foot had in Traugott's overall condition and in the destruction of his talus. Dr. Grimes thought the osteomyelitis "led to [the talus's] destruction and was the ultimate cause" of the need for surgery. Dr. Marilyn Yodlowski, ARCTEC's orthopedist, thought the osteomyelitis triggered or combined with Charcot foot to cause the talus's destruction. And Dr. Carol Frey, the Board's second independent medical evaluation (SIME) doctor, thought the osteomyelitis caused acceleration of Traugott's Charcot foot, and that this acceleration was the cause of the need for surgery.

The doctors testified about diabetic ulcers and blister formation as well because Traugott reported that a blister developed on his affected foot in May and then several weeks later his nearby skin opened and began draining fluid. Doctors involved in the case agreed that even unruptured blisters can become infected. As Dr. Frey explained, bacteria can enter the body when there is "a compromise in the skin," including not only unopened blisters but also a callus or "even a hot spot on the skin." Dr. Frey and Dr. Grimes indicated that the liquid in a blister is a good growth medium for bacteria. Skin ulcers can develop in people with peripheral neuropathy even if they do not have Charcot foot, and diabetics who do not have Charcot foot can have problems with infections. Traugott had developed at least one diabetic ulcer in the past on his second toe on the same foot from "a corn that eroded."

Traugott was required to wear steel-toed shoes, and while working for ARCTEC he wore "brand new" steel-toed boots. He described them as "leather lace-up" boots that extended above the ankle. Dr. Frey explained that boots are more likely to cause blisters because they are designed to fit more snugly around the arch. Prior to

Traugott's work for ARCTEC, his doctors had not restricted his activities and had not required him to wear a specific type of shoe. In terms of his overall foot care, Traugott testified that while at Tin City he did his best to keep his feet clean and dry, as his doctors had advised.

**B.    Traugott's Injury And Treatment Through Late 2015**

In May 2013, while he was at Tin City, Traugott noticed a blister "[l]ess than the size of a dime . . . [i]n the arch of [his] right foot," in the middle of the foot and "[t]owards the edge of the outside." He treated it himself and thought it "healed up within a couple of weeks." He described it as "a regular blister" and said that it did not "break or open" until several weeks later.

Around July 5, the skin on the sole of Traugott's right foot split open about an inch from the blister site and closer to the center of the foot. He said that the foot became painful, that he was working on ladders at the time, and that he was about halfway through his shift when he noticed symptoms. He continued to work after the pain started, and he noticed a discharge, which he could smell, coming from the opening when he took off his boots. Traugott reported his foot problem to his supervisor, and ARCTEC arranged for ground transportation from Tin City to the nearest village the next day. Traugott then took a commercial flight to Nome, where he took a cab to the hospital.

The hospital notes show that Traugott had a fever and a "fetid" discharge from a wound on the bottom of his foot. At the time of admission Traugott reported "some chills, some sweats, and fevers" and "increasing pain in his right foot though he ha[d] continued to work climbing ladders, etc." He was admitted with a diagnoses of

cellulitis, a skin infection.[1]  Doctors in Nome debrided the wound, removing infected tissue.  One doctor probed the wound; the discharge summary said, "When the wound was probed, bone was not evident.  It was not touched by the probe."  A CT scan showed a "sinus tract," or abnormal passage,[2] extending from the ulcer.  The doctors in Nome were unable to rule out acute osteomyelitis because a CT scan is not sufficiently sensitive and no MRI was available in Nome.  Traugott remained hospitalized for several days, receiving intravenous antibiotics, and had a second debridement.  His overall condition improved, he was discharged with crutches and a cast boot, and he went home to Amarillo on a commercial flight.  ARCTEC filed a report of injury with the Board while Traugott was hospitalized in Nome.

After returning to Amarillo, Traugott consulted with Dr. Patrick Crawford, his podiatrist.[3]  Dr. Crawford ordered imaging studies, which were done more than a week after Traugott's return to Amarillo, and after reviewing them Dr. Crawford suggested surgical debridement.  The imaging studies were inconclusive about whether there was osteomyelitis.  Before the surgery, Dr. Pablo Rodriguez, an infectious disease doctor, examined Traugott and observed that he had "a deep probing wound to bone, hence by definition an infected joint and osteomyelitis."

Dr. Crawford's surgery notes indicate "the ulcer was excised from the foot in toto."  Dr. Crawford also performed an exostectomy, or removal of a bony growth,[4]

---

[1]     THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 694 (Robert S. Porter, ed., 19th ed. 2011).

[2]     *Tract*, STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

[3]     A podiatrist is a foot doctor and can treat Charcot foot.  According to Traugott, Dr. Crawford died while the case was pending.

[4]     *Exostectomy*, STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).  An
(continued...)

in the "plantar aspect [of the] lesser tarsal region [of Traugott's] right foot."  About this time ARCTEC filed a notice of controversion, asserting that the condition was not work related.

After discharge from the hospital, Traugott received home care from wound-care nurses.  The wound at first appeared to improve, but in early October it was again showing signs of infection and Dr. Rodriguez raised the possibility of an amputation.  Traugott continued to receive home health care for the wound until November 2013, at which time his insurance denied further coverage and he was unable to pay for it.  He then saw an outpatient department of the hospital for wound care.  When Traugott consulted Dr. Rodriguez in late December, Dr. Rodriguez saw "no evidence of cellulitis, no osteomyelitis.  No streaking redness or drainage."  He thought "the wound to [the] right foot [was] resolved with no evidence of infection at this time" and took Traugott off antibiotics.  Traugott became eligible for Social Security disability benefits in January 2014; the Social Security Administration found his disability began in July 2013.

In January 2014 Traugott contacted Dr. Crawford because his right foot had been red and swollen for a few days; Dr. Crawford dispensed diabetic footwear to Traugott about two weeks later.  Dr. Crawford debrided the area again in late February and found "quite a bit of semicoagulated blood [with a] foul odor."  A microbiology report showed evidence of infection, and Traugott again took antibiotics.  The wound did not improve, and in April Traugott returned to outpatient treatment at the hospital for wound care.  By June, after getting wound care three times a week, the wound appeared

---

[4]    (...continued)
exostosis is "[a] cartilage-capped bony projection arising from any bone that develops from cartilage."  *Exostosis*, *id.*

to improve but a culture showed the same bacteria, so his doctor prescribed him a different antibiotic.

In September Traugott's care was transferred to the hospital's Advanced Wound Care clinic, and Dr. Mark Drew began treating Traugott. At that time the wound was "2.2cm length x 2.5cm width x 1.1cm depth." Traugott continued to receive wound care for months. Another clinic physician became concerned about osteomyelitis and ordered an MRI, which showed changes in a number of bones: "the cuboid, sinus tarsi and anterior calcaneus and talus." Other bones in his foot, the navicular and cuneiforms, were "unchanged" from previous imaging studies. The MRI report indicated possible osteomyelitis in the cuboid, anterior calcaneus, and talus, but also said any changes in the navicular and cuneiforms could be related to Charcot foot. Dr. Drew and Dr. Crawford agreed it would be appropriate to treat the wound using hyperbaric oxygen therapy.

Treatment with hyperbaric oxygen therapy and antibiotics began in early November; Traugott was discharged from hyperbaric oxygen treatment in late December after his wound closed. Traugott's doctors thought the "imaging findings [were] due to Charcot [foot] more than osteomyelitis."

In early January 2015 Traugott saw Dr. Crawford because his foot was again swollen and painful. X-rays showed "partial dislocation at the lateral right ankle," and Dr. Crawford diagnosed Charcot foot. In late March Traugott developed an ulcer between two toes that resolved by mid-May. The area on his arch from the previous infection had a callus but "did not re-ulcerate."

Traugott was referred to an orthopedic surgeon in Amarillo, who recommended a below-the-knee amputation, which Traugott did not want. In July Dr. Crawford signed a physician's report saying Traugott's condition was work related as follows: "Stress to right foot caused blister/open area leading to infection and ulcer."

Traugott, through an attorney, filed a written workers' compensation claim with the Board, seeking several benefits. ARCTEC filed a second controversion, controverting all benefits in the claim.

Traugott was then referred to Dr. Grimes, a professor at Texas Tech University School of Medicine in Lubbock, who performs surgeries as part of his job with Texas Tech. Dr. Grimes saw Traugott in the fall of 2015 and discussed two options with him: an amputation or placement of a rod in the ankle joint. Dr. Grimes said Traugott was not a candidate for an ankle replacement because of his peripheral neuropathy. Dr. Grimes was aware that Traugott had been treated for an infection but thought it had resolved. He was under the impression he was dealing with "Charcot of the hindfoot associated with a prior infection in the midfoot." On examination Traugott did not show signs of overt infection in his foot; the "foot was not red or warm"; and "[h]e didn't have a drain wound." Dr. Grimes thought the x-rays "looked like the typical Charcot collapse of the talus and navicular."

Dr. Grimes performed a fusion surgery on Traugott's right ankle. During the surgery Dr. Grimes noticed that Traugott's ankle did not look like the usual Charcot foot, and he took bone samples for evaluation. The pathology reports showed that Traugott had osteomyelitis. This raised the question whether the osteomyelitis, Charcot foot, or a combination of them, caused the destruction of the talus.

Dr. Grimes later testified that had he known Traugott had an ongoing infection in his ankle, he would have proceeded differently. He testified that because of the infection Traugott might require a second surgery to remove the hardware from the first surgery, but as of the Board hearing in 2017, it was not clear whether or when that would be needed. Traugott and his doctors considered the surgery successful. Over time he was able to almost completely eliminate use of pain medication and could walk with a cane; his only ongoing medication for the ankle at the time of the hearing was an

antibiotic. The legal proceedings, however, were only beginning as the surgery was completed.

### C.    Workers' Compensation Proceedings

Dr. Yodlowski did an employer's medical evaluation (EME) in January 2016. She was limited to a records review due to Traugott's travel restrictions at the time. Dr. Yodlowski gave the opinion that the substantial cause of Traugott's medical condition was his diabetes.

The Board first held a hearing on the merits of the case in February 2016. Several witnesses testified, including Traugott and Dr. Yodlowski, and the Board had the deposition testimony of Dr. Grimes. The Board made a number of factual findings in its decision, but it "noted both gaps in the medical record and its own lack of understanding of the medical evidence." It decided to order an SIME with Dr. Frey, an orthopedic surgeon who specializes in feet and ankles. The Board also made factual findings about Traugott's medical condition based on his medical records. The Board's legal discussion included references to "the 'eggshell skull doctrine,' under which an employer takes an employee as he finds him." The Board cited two of our decisions, *DeYonge v. NANA/Marriott*[5] and *Fox v. Alascom, Inc.*,[6] and one Commission decision, *City & Borough of Juneau v. Olsen*,[7] for the proposition that Traugott's injury could be

⁵    1 P.3d 90 (Alaska 2000).

⁶    718 P.2d 977 (Alaska 1986), *superseded in part by statute* ch. 79, §§ 21, 42, SLA 1988, *as recognized in Kelly v. State, Dep't of Corr.*, 218 P.3d 291, 299 (Alaska 2009) (observing that legislature amended the Act in 1988 and "removed the presumption of compensability" in workers' compensation cases involving mental stress causing mental injury, also known as mental-mental cases).

⁷    A W C A C   D e c .   N o .   1 8 5   ( A u g .   2 1 ,   2 0 1 3 ), http://labor.state.ak.us/WCcomm/memos-finals/D_185.pdf.

"compensable if his work activities aggravated, accelerated, or combined with the pre-existing conditions to cause the diabetic ulcer that resulted in osteomyelitis."

ARCTEC filed a petition for reconsideration, asking the Board to make supplemental findings and arguing that the "eggshell skull doctrine" did not apply, primarily because *Fox* was "bad law."[8] It contended no SIME was needed. The Board denied reconsideration. Further disputes arose related to the wording of SIME questions, with the Board issuing a third decision.

Almost eleven months after the first hearing, Dr. Frey issued her SIME report, which addressed written questions from the Board and both parties. Dr. Frey listed 22 causes of Traugott's disability. She said that Traugott's "employment injury combined with pre-existing condition of diabetes and neuropathy to produce a break down in [his] foot and introduction of infection." She also indicated that Traugott had told her "that he continued to work on ladders and climbing and walking, despite pain [in] the mid arch." She stated that working in spite of pain contributed to the breakdown in the skin; "[o]therwise, there are no records to indicate that he had another site of infection at the time." Dr. Frey wrote, "Osteomylitis, [sic] charcot arthropathy, breakdown of the ankle are the conditions that are contributed to by his work. This condition is mainly a result of the diabetes and neuropathy, his preexisting condition, but clearly accelerated by his work injury."

In response to the Board's question asking which of the identified causes was "the substantial cause" of the disability or need for medical treatment, Dr. Frey responded: "Overall cause: 75% diabetes & neuropathy[;] 25% work conditions[.] Acceleration[:] 100% work related. Therefore, for this particular disability at this

---

⁸ *See Kelly*, 218 P.3d at 298 (observing that legislature's purpose in removing presumption of compensability in mental-mental cases was to overrule *Fox*).

particular point in time, the work injury is the SUBSTANTIAL CAUSE." Dr. Frey answered other questions, but no other answer to a Board question was as controversial.

Responding to Traugott's questions, she agreed there was no "significant evidence" that Traugott had osteomyelitis until July 2013 or later; she also said the type of work activity Traugott did could lead to blisters, "especially with boots and ladder use." Answering ARCTEC's questions, Dr. Frey said she would regard the following as causes and attach responsibility to them: Traugott's "[w]orking through pain and . . . loading his midfoot, not only by wearing a boot . . . but also use of ladders & long term standing." In response to another question from ARCTEC, Dr. Frey set out the causal chain related to "the substantial cause" as follows:

> Had it not been for his skin ulcer he would not have had osteomyelitis. Had it not been for his work injury, he would not have had the skin ulcer at the time he had it. He very well may have had a skin break down at some point in time, but it is not possible to know when.

The parties deposed Dr. Frey to seek clarification of her responses.

Dr. Frey testified she considered both the Charcot foot and the osteomyelitis to be responsible for the talus disintegration. She gave the Charcot foot and the osteomyelitis equal weight in terms of causing the actual destruction of the bone, but she thought the work injury accelerated the talus's destruction. She testified that an infection causes "a change in mechanics," and in a foot "with a joint that's already mechanically not good, it just accelerates the breakdown of the joint." At the hearing Dr. Frey agreed with Dr. Yodlowski that the combination of osteomyelitis and Charcot foot "accelerates the need for treatment" and said that "having an infection superimposed on Charcot accelerates it."

Dr. Frey identified wearing boots and using ladders as work-related factors contributing to Traugott's condition because boot design generally puts more pressure

on the arch and prolonged standing on ladders would add pressure as well. Dr. Frey did not consider it important that Traugott reported that the May blister had healed; she appeared to accept that the crack that opened in July was from the May blister and that the bacteria had continued to spread even though Traugott thought the blister had healed.

At her deposition, Dr. Frey testified that there was "probably a 25 percent chance" that Traugott would have had a problem with Charcot foot had he not had the infection. When asked whether she had an opinion about "whether the work activities versus other non-industrial factors played the greatest role in the skin breakdown and infection," she answered that "[t]he work activity caused the skin breakdown and the infection." She did not seem to think that "[t]he mere fact that he's diabetic with Charcot" would inexorably lead to a destroyed talus; she thought his work activity was critical in causing his disability and need for medical treatment.

The Board held its final hearing in July 2017. All three doctors testified, in addition to Traugott.[9] Much of the doctors' hearing testimony was similar to their earlier testimony; disagreements between the doctors were mainly related to causation.

Dr. Yodlowski provided more detail about how osteomyelitis spreads and how Charcot foot could be a factor in its spread. Essentially, as Charcot foot causes bone destruction, the bone destruction in turn affects the joints, and the affected joints provide a route for the infection to spread.

Dr. Grimes thought the osteomyelitis was the main cause of the talus's destruction. He thought the midfoot infection that was clearly documented in Traugott's medical records was the origin of the osteomyelitis in the hindfoot, which in turn led to

---

[9] Before the hearing Dr. Yodlowski did a supplemental EME report related to the reasonableness of the type of surgery Dr. Grimes performed, an issue the Board considered separately from the causation question. Because ARCTEC did not appeal this issue, we do not discuss it further.

the need for surgery and Traugott's ongoing inability to return to the work he had been doing. Dr. Grimes had testified at his deposition that he thought Dr. Crawford's determination that Traugott's blister led to the midfoot infection was reasonable, but because he had no personal knowledge of the wound or Traugott's work activities, he was not willing to testify that work activities were the underlying cause of the osteomyelitis.

Dr. Yodlowski considered the Charcot foot and Traugott's underlying diabetes to be the chief cause of the talus's destruction and thus the substantial cause of his disability and need for medical treatment. She agreed that the osteomyelitis may have changed his treatment. Dr. Yodlowski acknowledged that walking and standing put pressure on the midfoot of "a diabetic with a Charcot deformity," but she considered the activities Traugott was performing at work to be no different from his recreational activities. She also thought the infection had a different origin than the May 2013 blister. Relying on Dr. Crawford's surgery notes about the exostectomy, she theorized that the exostosis wore a hole in the skin through which bacteria entered. Dr. Yodlowski gave the medical opinion that Traugott's work activities at ARCTEC should not "be assigned legal responsibility" for his need for medical treatment.

Dr. Frey confirmed her opinion that "the osteomyelitis accelerated the underlying pre-existing Charcot causing it to be symptomatic at this time." Dr. Frey agreed that Traugott's "work on ladders with boots" was an important part of the causation chain and agreed that the osteomyelitis was "the substantial cause of the acceleration of the underlying Charcot causing Mr. Traugott's disability and need for treatment." When ARCTEC's attorney asked Dr. Frey whether she had an opinion about "whether the work activities were so important of a cause that [she] would feel comfortable attaching legal responsibility to them," she initially responded, "Is it my job to attach the legal responsibility?" Dr. Frey then indicated that in her opinion the work

**7456**

activities for ARCTEC were "not trivial" and "they have responsibilities." Dr. Frey also explained why she did not consider Traugott's earlier infections to be important in her causation analysis — they were widely spaced in time and both "had explanations outside of diabetes."

ARCTEC's attorney and Dr. Frey engaged in an extended question-and-answer sequence about causation. Dr. Frey explained her responses to the Board's questions, indicating she had separated out acceleration based on the Board's second question, which asked: "If, in your opinion, one cause of Joseph Traugott's disability, or need for medical treatment is a preexisting condition, did the 2013 employment injury aggravate, accelerate, or combine with the preexisting condition to cause disability or need for treatment?" She also testified that "the pre-existing conditions did nothing to accelerate" and "[i]t was a pre-existing condition that more probabl[y] than not would have been just fine for the rest of his life." She insisted that work was the sole cause of Traugott's acceleration, even though she acknowledged that his diabetes was necessary for development of the resulting medical condition. But she emphasized that "most people with diabetes" and with Charcot foot do not develop "a diabetic ulcer with infection."

The Board decided that Traugott's work with ARCTEC was "the substantial cause of his disability or need for medical treatment" and that the surgery Dr. Grimes performed "was reasonable and necessary." The Board determined Traugott had attached the presumption of compensability and that ARCTEC had rebutted it. The Board then weighed the evidence, in particular the diverging opinions from the doctors, to decide whether Traugott met his burden of proof.

The Board gave the least weight to Dr. Yodlowski's testimony for several reasons. First, it thought she misunderstood the issue of legal causation when a worker has a preexisting condition. It noted her testimony that "hundreds, thousands of people

work at ARCTEC and do similar types of jobs and they don't get those conditions [that Traugott developed], so, no, there's no basis for the work . . . being the cause of those conditions." In the Board's view, the causation question was "whether the work would cause someone with the conditions of diabetic neuropathy and Charcot foot, like [Traugott], to become disabled or need medical treatment." The Board discounted her testimony about "a bone wearing through the skin" because nothing in the record documented this theory. It also wrote that "Dr. Yodlowski's focus on the lack of medical literature regarding an increased risk of blisters or diabetic ulcers from working on ladders ignores common experience." The Board gave more weight to Dr. Grimes's and Dr. Crawford's opinions; it thought that together their opinions established "a complete chain of causation" between the May 2013 blister and the infection in the talus.

The Board gave the most weight to Dr. Frey's opinion, interpreting her testimony as saying that even though the underlying diabetes and peripheral neuropathy were important factors in the development of Traugott's disability and need for medical treatment, his work for ARCTEC was the most likely cause of the acceleration and thus was primarily responsible for his current disability and need for treatment. The Board responded to ARCTEC's suggestion that Dr. Frey's opinions were suspect because she focused exclusively on factual cause and "ignored" the legal causation requirement by observing that its referral letter gave a definition of "the substantial cause." It saw no indication Dr. Frey had "ignored that instruction."

The Board then "evaluate[d] the relative contribution of different causes of the disability . . . or the need for medical treatment." The Board acknowledged that Traugott's "preexisting diabetes and neuropathy are, without question, significant factors in his disability and need for medical treatment." But the Board pointed to Dr. Frey's testimony that the "preexisting conditions would have been just fine for the rest of his life absent the work injury" to conclude that "[i]n comparison to all other causes, the

May 2013 blister, together with the subsequent infection, is the substantial cause of [Traugott's] disability and need for medical treatment." The Board issued an order deciding Traugott's disability and need for treatment were compensable and retained jurisdiction as to his entitlement to specific benefits.

ARCTEC appealed to the Commission and moved for a stay of the Board's decision. Traugott opposed the stay, raising multiple objections. The Commission held oral argument on the motion and issued a stay conditioned on ARCTEC's filing a bond. ARCTEC did not comply with the Commission's order promptly, and almost a month later the Commission sent ARCTEC a Notice of Default under one of its regulations.[10] Traugott asked for reconsideration of both orders, but the Commission refused to reconsider anything because it did not think it had reconsideration jurisdiction. Traugott petitioned for review of the Commission's stay-related decisions, and we denied review.[11] ARCTEC filed the bond on December 12, 2017.

Before the Commission ARCTEC argued that the Board committed legal error by applying the "eggshell skull doctrine" because in ARCTEC's view the 2005 change in the causation standard "statutorily negated the eggshell skull rule in Alaska workers' compensation cases, and did so generally" so that "[n]othing remained of the eggshell skull rule." ARCTEC also seemed to argue that *Fox v. Alascom, Inc.*[12] had been overruled with regard to an aggravation of *any* condition, not just mental injury claims. ARCTEC contended that the Board failed to apply Commission precedent and, based on

---

[10]    8 Alaska Administrative Code (AAC) 57.250(a) (2011).

[11]    *Traugott v. ARCTEC Alaska, Inc.*, 420 P.3d 1142, 1142 (Alaska 2018).

[12]    718 P.2d 977 (Alaska 1986). In *Kelly v. State, Department of Corrections*, we recognized that the legislature overruled *Fox* with respect to mental stress claims in workers' compensation. 218 P.3d at 298-99.

a statement from an occupational disability case,[13] that "it remains unclear whether 'the substantial clause' [sic] means 'more than any other cause' versus 'more than 51%.' " ARCTEC argued that the Board required Traugott to prove only one part of causation, "but for" causation. ARCTEC maintained that it was not asking the Commission to reweigh the evidence but was simply asking the Commission to consider one of Dr. Frey's opinions — the 75% and 25% division — and decide that this specific opinion resolved the case in its favor as a matter of law.

Traugott responded that the 2005 amendments to the Act did not eliminate the compensability of aggravation claims, arguing that the legislature specifically rejected this approach during its consideration of the 2005 amendments and quoting legislative history to support his position. He relied on Oregon case law to argue that "a preexisting condition that makes a worker more susceptible to a workplace injury is not, itself, a cause that can be used to defeat a claim for compensation." He asked the Commission to recognize that his preexisting condition did not cause the infection, but made him more susceptible to it, meaning that the diabetes should not be considered a cause of his disability or need for treatment.

The Commission decided that Traugott had not proved his claim by a preponderance of the evidence. With respect to the question of causation, the Commission identified the Board's task as "determin[ing] when the work injury is just one component in the need for medical treatment and when the work injury is the substantial cause," meaning that "the aggravation or acceleration cannot be viewed in isolation, but must be factored into the query 'is the work the substantial cause?' " The Commission examined Dr. Frey's response apportioning causation for the overall

---

[13] *See Shea v. State, Dep't of Admin., Div. of Ret. & Benefits*, 267 P.3d 624, 636 (Alaska 2011) (discussing causation in occupational disability under Public Employee Retirement System).

condition as 75% related to diabetes and 25% to the work conditions, but assigning 100% responsibility for the acceleration to the work conditions.  The Commission wrote that "[w]hile the acceleration by itself was 100% work-related, this [was] not the proper question" because "[a]cceleration may not be viewed in isolation, but must be evaluated along with all 'other causes' in order to determine 'the substantial cause' for the need for medical treatment."  In the Commission's view, the Board gave Dr. Frey "conflicting instructions and did not ask her to weigh all causes after looking at the effect of the possible acceleration of Mr. Traugott's condition from the work incident."

The Commission then went on to provide a critique of Dr. Frey's testimony, identifying what it saw as contradictions in it.  The Commission discussed one of its decisions[14] and interpreted that decision as requiring the Board to weigh different causes against each other to decide which was "the substantial cause."  The Commission cited testimony from the legislative history with an example of diabetic neuropathy; the cited testimony indicated that the Board would need to assess whether the substantial cause of later medical care was due to the work injury or the neuropathy.  The Commission then stated that Dr. Frey did not do this.  The Commission declared that Dr. Frey's overall causation opinion was "substantial evidence that Mr. Traugott's pre-existing condition was the substantial cause of his need for medical treatment."  It decided that Dr. Frey's opinion about the acceleration was "not substantial evidence in the record as a whole because it [was] based on a misstatement of the law."  The Commission wrote:

> When Dr. Frey properly weighed all causes, AS 23.30.010(a), she unequivocally stated that 75% of the need for medical treatment was his diabetes and neuropathy and 25% was work conditions.  Thus, work could not be the

---

[14]  *City of Seward v. Hansen*, AWCAC Dec. No. 146 (Jan. 21, 2011), http://labor.state.ak.us/WCcomm/memos-finals/D_146.pdf.

substantial cause of his need for medical treatment. The Board erred in finding work was the substantial cause.

The Commission said the Board had "incorrectly asked Dr. Frey to ignore the requirement in AS 23.30.010(a) that all causes must be evaluated to determine 'the relative contribution of different causes of . . . the need for medical treatment,' " (alteration in original) yet it never identified where the Board did this. The Commission criticized the Board for "abrogat[ing] its duty" and "mislead[ing] its SIME physician with misstatements of the law." In its legal analysis the Commission discussed only Dr. Frey's testimony; it did not discuss any other evidence or the Board's analysis of that evidence.

Traugott appeals.

## III. STANDARD OF REVIEW

In a workers' compensation appeal from the Commission, we review the Commission's decision and not the Board's.[15] "We apply our independent judgment to questions of law that do not involve agency expertise, including issues of statutory interpretation," and "interpret a statute 'according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its purpose.' "[16] We review de novo the Commission's legal conclusion about whether substantial evidence supports the Board's factual findings by "independently review[ing] the record and the Board's factual findings."[17]

---

[15] *Alaska Airlines, Inc. v. Darrow*, 403 P.3d 1116, 1121 (Alaska 2017).

[16] *Vandenberg v. State, Dep't of Health & Soc. Servs.*, 371 P.3d 602, 606 (Alaska 2016) (quoting *Louie v. BP Expl. (Alaska), Inc.*, 327 P.3d 204, 206 (Alaska 2014)).

[17] *Smith v. CSK Auto, Inc.*, 204 P.3d 1001, 1007 (Alaska 2009).

## IV. DISCUSSION

### A. This Case Is A Susceptibility Case.

The Commission's decision in Traugott's case was issued before *Morrison v. Alaska Interstate Construction Inc.*, where we considered the new workers' compensation causation standard in the context of the last injurious exposure rule.[18] We decided that aggravation claims remain compensable after the 2005 amendments to the Act.[19] We affirmed the Board's application of the new causation standard in that case, deciding that "[t]he new standard leaves the Board discretion to choose among the identified causes the most important or material cause with respect to the benefit sought."[20] The parties here agree that last injurious exposure rule cases are a type of aggravation claim so that *Morrison* applies to the case.

The parties disagree, however, about whether this case involves susceptibility. In medicine "susceptibility" refers to an individual's likelihood "to develop ill effects from an external agent."[21] ARCTEC argues that this is not a susceptibility case because of the numerous complications Traugott had already suffered; in its view susceptibility should be confined to cases in which a worker had few or no complications of his underlying disease before the work injury. At oral argument before us ARCTEC was unable to articulate a legal test which would distinguish as a matter of law when a case was no longer a susceptibility case. It asserted that Traugott's foot "had

---

[18] 440 P.3d 224, 234-36 (Alaska 2019). The last injurious exposure rule required the last employer whose work was a substantial factor in causing a worker's disability to pay for the entire cost of the disability. *Id.* at 230 n.8 (citing *Ketchikan Gateway Borough v. Saling*, 604 P.2d 590, 595 (Alaska 1979)).

[19] *Id.* at 233-34.

[20] *Id.* at 238, 240.

[21] *Susceptibility*, STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

been deteriorating for years," and that because of the "long history of deterioration," his work for ARCTEC could not be the most important factor in causing his disability and need for medical care.

Traugott, in contrast, maintains that his diabetes and Charcot foot made him more susceptible to the blister and the resulting osteomyelitis. Traugott relies on Oregon law to argue that conditions that merely make a worker more susceptible to an occupational disease or injury should not be included in the causation analysis for work-relatedness.

We reject the argument that a legal line can be drawn among different degrees of deterioration resulting from a preexisting condition to determine that some conditions are not work related as a matter of law. As we held in *Morrison*, the new standard of legal causation, while more restrictive than the old one, "remains flexible" and "is necessarily fact-dependent."[22] Indeed, ARCTEC acknowledged at oral argument before us that every case is "fact specific," making it impossible to articulate a standard that would preclude the possibility of an injury being work related as a matter of law.

We also reject Traugott's argument that certain preexisting conditions must be excluded from the causation analysis. Nothing in our statute or the legislative history suggests this legal rule. Indeed the legislative testimony the Commission cited explicitly referred to a worker's preexisting diabetes as a factor the Board might consider in its causation analysis related to complications from a work injury. A rule allowing all preexisting conditions to be factored into the causation analysis may have a disproportionate impact on people with preexisting, partially disabling conditions. It is possible that workers who have suffered more complications from their medical conditions could have a more difficult time establishing as a factual matter that a work-

---

[22]     440 P.3d at 238.

related injury or illness was the most important factor in causing their disability or need for medical treatment because of their many extant complications. But this is consistent with the legislature's intent "to narrow the compensability standard" for workers' compensation.[23]

At oral argument before us, ARCTEC said it was "not credible" for the Board to determine that work was the substantial cause of Traugott's disability and need for medical treatment because of Dr. Frey's estimate that work was 25% responsible for Traugott's overall condition. But Dr. Frey's testimony about causation was remarkably similar to the SIME physician's opinion in *Morrison*. In *Morrison* the SIME doctor estimated that if he were in an apportionment jurisdiction, he would allocate causation "about 80% to 90% to the 2004 injury and 10% to 20% to the 2014 injury."[24] He said both injuries were responsible for the claimant's condition, but he thought the 2014 injury was the substantial cause of the need for medical treatment.[25] The Board accepted this doctor's opinion,[26] and we reinstated the Board's award because the statute permits the Board to determine which cause among all those identified is the most important or material cause of the current disability and need for medical treatment, even if an expert does not regard the cause as having more than 50% responsibility for the condition.[27] The legislature clearly intended to reduce workers' compensation coverage for workers

---

[23]    *Id.* at 237.

[24]    *Id.* at 230.

[25]    *Id.* at 228.

[26]    *Id.* at 230.

[27]    *Id.* at 237-38, 240.

with preexisting medical conditions, but it chose to do so by imposing a higher standard for legal causation, not by excluding some workers from coverage as a matter of law.

**B.     But-For Causation Remains A Component Of The Compensability Analysis.**

In its decision, the Commission wrote, "The 'but for' test has been superseded by the requirement in AS 23.30.010(a) that all causes be weighed against each other before work can be found to be the substantial cause of the ongoing disability."  At oral argument before us and in its supplemental brief, ARCTEC contended that but-for causation was no longer applicable in workers' compensation after the 2005 amendments.  Because but-for causation remains part of workers' compensation, we discuss this issue briefly to provide clarification.

In its discussion, the Commission wrote that "the 'but for' test alone is not sufficient to establish compensability" because of the new causation standard.  However, the but-for test "alone" has never been sufficient to establish compensability because it has always been just one component of what a worker must prove to establish his claim.

The but-for test, as we noted in *Morrison*, represents factual cause.[28]  But-for causation was only one part of the pre-2005 causation analysis, and it remains part of the post-2005 causation analysis.[29]  Before the 2005 amendments a worker needed to prove at the third stage of the presumption analysis that work was a substantial factor in his disability or need for medical treatment.[30]  To prove this, the worker needed to show both that work was a but-for (or factual) cause *and* that it was important enough as a

---

[28]     *Id.* at 237.

[29]     *Id.*

[30]     *Huit v. Ashwater Burns, Inc.*, 372 P.3d 904, 907 (Alaska 2016).

cause that reasonable persons would regard it as a cause and attach responsibility to it.[31] The 2005 amendments did not change the but-for or factual part of compensability. For a disability to be compensable, work must still be a factual cause of the disability or need for medical treatment.[32] The 2005 amendments changed the proximate or legal cause component of the compensability analysis. Now the Board must determine which among the different causes-in-fact is the most important in the current disability or need for medical care.

Aggravation claims remain compensable, and a worker still must show that the work injury was a cause-in-fact of his disability or need for medical care. Our decision in *Fairbanks North Star Borough v. Rogers & Babler* dealt with the cause-in-fact component of the causation analysis,[33] and it remains applicable. *Rogers & Babler* involved successive injuries and the last injurious exposure rule.[34] There we rejected an employer's argument that "application of the 'but for' test would make the last injurious exposure rule a nullity" because if a worker had a degenerative condition that would inevitably make him disabled, he could never show that work was a cause-in-fact of his disability.[35] We instructed that a "claimant need only prove that 'but for' the subsequent

---

[31]    *Id.* (quoting *Williams v. State, Dep't of Revenue*, 938 P.2d 1065, 1072 (Alaska 1997)).

[32]    *Cf. id.* at 919 ("[S]omething cannot be 'the substantial cause' of a disability if it is not a cause at all.").

[33]    747 P.2d 528, 532-33 (Alaska 1987); *see also id.* at 532 n.8 (noting that because the parties did not contest applicability of "the second aspect of the substantial factor test," the decision did not discuss it).

[34]    *Id.* at 529-30.

[35]    *Id.* at 532-33.

trauma the claimant would not have suffered disability at this time, or in this way, or to this degree."[36]

Here, to show that the work at ARCTEC was a cause-in-fact of his disability and need for medical care, Traugott needed to establish that but for his work at ARCTEC he would not have suffered the disability at that time, in that way, or to that degree. No one disputes that he did so. The Board then needed to determine whether work was the most important of the identified causes of his disability and need for medical care.

### C. Substantial Evidence In The Record Supports The Board's Decision.

The Commission decided that the Board committed legal error by asking Dr. Frey "misleading questions," but it never identified which questions were misleading and how they were misleading. The Commission quoted a number of questions the Board asked Dr. Frey as well as the Board's instructions to her about Alaska workers' compensation law, but it did not identify which question or instruction it considered legally unsound or explain why it was erroneous. The Commission's failure to identify which SIME question or instruction was erroneous makes its decision difficult to review.

ARCTEC contends that the Commission correctly determined that the Board committed legal error, but its argument is essentially a factual one. ARCTEC cited the testimony of both Dr. Grimes and Dr. Yodlowski, whose opinions the Board gave less weight, to support its argument and offered its own interpretation of Dr. Frey's report.

We have held in tort cases that "determinations of proximate cause usually involve questions of fact" and that "proximate cause becomes a matter of law only where

---

[36] *Id.* at 533.

reasonable minds cannot differ."[37] The same analytical approach applies in workers' compensation, as previous decisions from both the Commission[38] and this court[39] illustrate. The new causation standard "remains flexible" and "is necessarily fact-dependent,"[40] so the Board's determination of which cause is the most important or material cause must be reviewed as a factual issue using the substantial evidence test.

The legislature requires the Commission to uphold the Board's findings of fact "if supported by substantial evidence *in light of the whole record*."[41] Substantial evidence is "relevant evidence which a reasonable mind might accept as adequate to support a conclusion."[42] The Commission has used this precise wording to define substantial evidence.[43] And it has said in many past decisions that it "will not reweigh conflicting evidence, determine witness credibility, or evaluate competing inferences from testimony because those functions are reserved to the Board."[44] It has cited our

---

[37] *Winschel v. Brown*, 171 P.3d 142, 148 (Alaska 2007).

[38] *See, e.g.*, *Buchinsky v. Arc of Anchorage*, AWCAC Dec. No. 189, at 9-10 (Dec. 2, 2013), http://labor.state.ak.us/WCcomm/memos-finals/D_189.pdf (stating that Commission cannot reevaluate evidence but must consider whether Board's conclusions are based on substantial evidence).

[39] *See, e.g.*, *Runstrom v. Alaska Native Med. Ctr.*, 280 P.3d 567, 575 (Alaska 2012) (affirming decision based on substantial evidence review).

[40] *Morrison v. Alaska Interstate Constr. Inc.*, 440 P.3d 224, 238 (Alaska 2019).

[41] AS 23.30.128(b) (emphasis added).

[42] *Childs v. Kalgin Island Lodge*, 779 P.2d 310, 312 n.1 (Alaska 1989).

[43] *Buchinsky*, AWCAC Dec. No. 189 at 8.

[44] *E.g.*, *Abonce v. Yardarm Knot Fisheries, LLC*, AWCAC Dec. No. 111, at
(continued...)

-27- **7456**

decisions about substantial evidence as the ultimate source of its rule.[45] Prior Commission decisions are precedential for the Commission as well as the Board.[46]

The Commission here effectively reweighed the evidence by drawing inferences from and making conclusions about Dr. Frey's testimony that the Board did not make. The Board considered the entirety of Dr. Frey's testimony, identifying specific parts of it to explain its decision. Instead of looking at the Board's findings and considering whether those findings were supported by substantial evidence in light of the whole record, the Commission decided that part of Dr. Frey's medical report was substantial evidence to support a finding that the Board *did not* make, but a different part, which supported the Board's finding, was "not substantial evidence in the record as a whole because it [was] based on a misstatement of the law," which the Commission never identified.

The Commission's legal analysis in this case does not reflect that it considered the record as a whole when making its decision. Our examination of the record shows that there is ample evidence a reasonable mind could accept as adequate to support the conclusion the Board made. We begin with Dr. Frey's hearing testimony, which the Board explicitly cited, that more probably than not Traugott's preexisting Charcot foot "would have been just fine for the rest of his life" had he not suffered the blister at work. In addition Dr. Frey testified at her deposition that Traugott would have

---

[44]     (...continued)
9 (June 17, 2009) (quoting *Lindhag v. State, Dep't of Nat. Res.*, 123 P.3d 948, 952 (Alaska 2005)), http://labor.state.ak.us/WCcomm/memos-finals/D_111.pdf.

[45]     *Id.*

[46]     *Alaska Pub. Interest Research Grp. v. State*, 167 P.3d 27, 45 (Alaska 2007) (construing AS 23.30.008(a) to mean that Commission decisions "serve as legal precedent for the Board and the Appeals Commission").

had about a 25% chance of developing Charcot foot without the work injury. And while Dr. Frey indicated at the hearing that Traugott likely would have developed another diabetic ulcer, she emphasized that most people with diabetes and Charcot foot do not develop a "diabetic ulcer with infection." Dr. Frey identified specific aspects of Traugott's work at ARCTEC that contributed both to the blister formation and to the osteomyelitis: Dr. Frey testified that ladders and boots "put extra stress in the arch area," and she observed that "generally people who have pain can rest" but that people can be motivated to work "until they get to a point where they can't work through pain." She also said that Charcot foot can develop after "repetitive actions," so that repeatedly climbing ladders in work boots could also have contributed to the worsening of Traugott's Charcot foot. When asked about legal responsibility for the disability at the hearing, Dr. Frey testified that work activities for ARCTEC were "not trivial" in and "ha[d] responsibilities" for the development of Traugott's condition. Because the Board accepted Dr. Frey's medical opinion that osteomyelitis accelerated Traugott's preexisting Charcot foot to cause the talus's destruction, these opinions are substantial evidence to support the Board's conclusion that Traugott's work was the most important or material cause of his disability and need for medical care.

Turning to the specific evidence the Commission relied on in its decision, both Dr. Frey's opinion about overall causation, which the Commission found persuasive, and her opinion that work was the substantial cause of Traugott's disability, which the Commission rejected, were found in Dr. Frey's response to a single question posed by the Board in the SIME. The Commission said that Dr. Frey's overall causation opinion represented "[w]hen Dr. Frey properly weighed all causes," but Dr. Frey's report never identified any cause other than the work-related blister as the substantial cause of the disability and need for medical care, indicating that the Commission drew its own inferences from her testimony. This is not substantial evidence review.

Finally, the Commission did not consider *the Board's* analysis of the evidence, instead focusing its legal discussion on Dr. Frey's testimony and what the Commission saw as its deficiencies. For example, the Commission discussed what it considered to be contradictions in her testimony and suggested that it was Dr. Frey's responsibility to weigh the various causation factors. While the Board gave Dr. Frey's testimony the most weight among the medical opinions before it, the Board — not Dr. Frey or any other medical expert — was the fact finder in this case. The Board, not Dr. Frey, was required to consider the possible causes of Traugott's disability and need for medical treatment and determine which of the possible causes was the most important in causing the disability and need for medical care. And the Board, not a medical expert, is charged with determining legal responsibility. Experts can provide opinions about the ultimate question in a case, but the Board as the fact finder has the authority to interpret an expert's opinion and decide what weight to give it.[47]

In its decision the Board cited Commission precedent about applying the new causation standard and discussed Traugott's preexisting diabetes and neuropathy. The Board clearly considered the preexisting conditions as potential causes in this case, saying those conditions "place[d] [Traugott] at significant risk for injury" and were "without question, significant factors in his disability and need for medical treatment" because without them, it was "highly unlikely" he would have suffered the injury he did. The Board also mentioned Dr. Frey's overall causation opinion and ARCTEC's concerns about her answers. But the Board cited Dr. Frey's testimony about wearing boots and working on ladders in addition to her opinion that Traugott's Charcot foot would likely

---

[47] AS 23.30.122 ("A finding by the board concerning the weight to be accorded a witness's testimony, *including medical testimony and reports*, is conclusive even if the evidence is conflicting or susceptible to contrary conclusions." (emphasis added)).

"have been just fine" had it not been for his work at ARCTEC. Weighing all of these factors, the Board concluded that "the May 2013 blister, together with the subsequent infection, is the substantial cause of [Traugott's] disability and need for medical treatment."

The Board did what it was required to do under the new causation standard by identifying factors contributing to the disability and need for medical care and deciding which among them was the most material or important one.[48] Our review of the entire record and the Board's decision leads us to conclude that substantial evidence in the record supports the Board's decision that Traugott's work-related injury was the substantial cause of his disability and need for medical treatment.

## D.    The Procedural Issues Are Moot.

In addition to his substantive claims, Traugott appealed and briefed several procedural decisions the Commission made related to the stay and bond on appeal. Specifically, he contended that the Commission erroneously decided it was without power to reconsider its non-final decisions, that the Commission erred in evaluating whether the appeal presented a "serious and substantial" question, that the amount of the bond was too low, and that the Commission improperly issued a default order.

We decided in another case that the Act does not prohibit the Commission from reconsidering its own non-final orders.[49] Because we reinstate the Board's award,

---

[48]    *See Morrison v. Alaska Interstate Constr. Inc.*, 440 P.3d 224, 238 (Alaska 2019).

[49]    *Warnke-Green v. Pro-West Contractors, LLC*, 440 P.3d 283, 290 (Alaska 2019).

Traugott would not be entitled to any further relief even if he prevailed on the procedural issues he raises, so those issues are moot.[50]

## V.      CONCLUSION

We REVERSE the Commission's decision and REMAND to the Commission with instructions to reinstate the Board's order.

---

[50]      *Ulmer v. Alaska Rest. & Beverage Ass'n*, 33 P.3d 773, 776 (Alaska 2001) (" 'We have further held that [a] case is moot if the party bringing the action would not be entitled to any relief even if' it prevails." (alteration in original) (quoting *Gerstein v. Axtell*, 960 P.2d 599, 601 (Alaska 1998))).